MORRISON v. CARPENTER.

1. NEGLIGENCE—LICENSEES—RAILROADS—PUBLIC WAY.

Where approaches to a walk over the bridge of a railroad corporation were used continually and openly by the public for years, with the permission and acquiescence of the company, persons using the approach were licensees and entitled to be protected at night against the danger arising from excavating in the passage by city contractors who constructed a sewer under the railroad right of way.[1]

2. SAME—EASEMENTS AND SERVITUDES—DANGEROUS OPENINGS OR EXCAVATIONS.

Ordinarily a licensee, passing over property, takes the risk of such dangers as have existed during the term of use, but not additional risks afterwards created by the licensor; if the latter interferes with the path by

---

[1] On the question of the duty of the owner of land which licensees are accustomed to cross, to guard against injuries in consequence of changes in the condition, see notes in 13 L. R. A. (N. S.) 1126 and 39 L. R. A. (N. S.) 217.

making it more dangerous he should give notice to the licensee or guard the dangerous place so made.

3. Same—Easements—License.

After granting a license to use his premises, the owner cannot, lawfully, by his affirmative action, change the premises so as to make them more dangerous, without notifying the licensee of that fact, or warning him of the added danger.

4. Same.

Whether plaintiff was guilty of contributory negligence in falling into the excavation in the dark, seeing one red light which did not sufficiently light the opening, was a question for the jury.

5. Same—Weight of Evidence.

Upon the testimony of two witnesses that there was no light at the west end of an excavation into which plaintiff fell, contradicted by three witnesses for defendant, the court did not err in denying defendant's motion for a new trial.

6. Trial—Argument—Conduct of Counsel Improper.

Where plaintiff's attorney in the course of his argument to the jury referred to defendant's contract with the city, stating that the defendants in estimating the cost of the sewer and the price to be charged took accidents into consideration and added a sufficient sum to cover such contingencies, the argument was misleading and erroneous, requiring the reversal of a judgment in favor of the plaintiff. It was also improper to refer to the price to be received for constructing the sewer, the price being immaterial to the issue.

7. Same—Misconduct of Attorney—Inflammatory Statements.

The following argument is also held to be improper: "Give him what you think he is entitled to. * * * Is $10,000 too much? Would you fall in that sewer for $10,000 and take your chances? Would you go through life that way? Would you have your son go through life that way? Uneducated boy! What can he do?" In the absence of any corrective instructions to the jury by the court, the conduct of plaintiff's attorney was erroneous and prejudicial.

Error to Kent; Brown, J. Submitted January 20, 1914. (Docket No. 151.) Decided March 26, 1914.

Case by Edward Morrison, by his next friend, against Charles J. Carpenter and Louis W. Anderson for personal injuries. Judgment for plaintiff, and defendants bring error. Reversed.

*Charles E. Ward,* for appellants.

*Powers & Eardley,* for appellee.

STONE, J.   The plaintiff, a young man 20 years old at the time of the injury complained of, brings this suit to recover damages for an injury received by him on the evening of October 23, 1911, resulting from his falling into an excavation in the right of way of the Pere Marquette Railroad Company, near the east end of that company's bridge across Grand river, in the city of Grand Rapids.  The excavation was made under the premises of the said railroad company by the defendants in pursuance, and in execution of, a contract between defendants and the city of Grand Rapids for building what is known as the east side trunk sewer in that city.  The river runs practically south at this point, and the sewer is substantially parallel with the river.

It is the claim of the plaintiff that on the evening in question, at about 6:30 o'clock, he had occasion to go from his place of residence, situated on Front street upon the west side of said river, to the home of his brother-in-law on Underhill street upon the east side of the river.  To do this it was necessary to cross Grand river from the west to the east side.  Instead of crossing the Wealthy avenue bridge, the plaintiff elected to cross the railroad bridge in question, claiming that it was a somewhat shorter route. The record does not show the exact length of this railroad bridge, but it appears that it runs diagonally across Grand river and is necessarily a bridge of considerable length.  At the time of the accident com-

plained of, there were two tracks on this bridge. It had a framework extending above the roadbed, and was so constructed that there was just room enough on the outside of these tracks to provide for the traffic of the road. The railroad company used the south track for the running of all its passenger and some other trains; and the north track was used for freight trains and for the storage and switching of freight cars. The two tracks were laid 8 feet apart. Between these two tracks there was a planking 4 feet wide laid between two wooden guard rails parallel with the tracks.

There is no question that the railroad company was the exclusive owner of the right of way between Front street upon the west side, and Market street upon the east side of the river, as well as of the land upon either side of the tracks between the river and Market street. From the river on the east side and Market street the railroad roadbed was raised from 12 to 14 feet above the surrounding land, and pedestrians who undertook to cross on the railroad right of way had to traverse this distance of nearly 300 feet before leaving the railroad tracks. There was no planking on the right of way east of the bridge between the tracks, but there was a well-defined path there. This sewer, extending along the east bank of Grand river, crossed under the Pere Marquette Railroad tracks between the east end of the railroad bridge and Market street. It appeared that the city had procured the right of way for the construction of this sewer. Defendants had no right to place anything whatever on the right of way where the tracks were; and it appeared that the defendants had already paid the railroad company for the right to bring lumber and material there to be used in the sewer.

The work on this sewer was begun some 50 days before the injury to the plaintiff, and defendants had

been working with their machinery in the immediate vicinity of the railroad tracks for at least 8 or 10 days at the time the plaintiff was injured. On the night of the accident, and for 'some time before that, the space between the rails of the tracks was planked over the excavation which had been made for the sewer. But there were no planks over the excavation between the tracks. The excavation was 16 or 17 feet long at the top, parallel with the tracks; and some 7 or 8 feet wide between the two railroad tracks; and it was 23 to 25 feet deep. Special pains had been taken to support the railroad tracks, and there were timbers in the excavation. The bottom of the sewer was being constructed of concrete which had been placed and had already set, and the testimony shows that the bottom of the sewer was as hard as a rock.

The negligence complained of by the plaintiff was the failure of the defendants to place a lantern on both sides of this excavation, it being testified to, and claimed by the plaintiff, that there was a lighted lantern, with a red globe, at the easterly side of the excavation, which he saw as he left the railroad bridge, about 100 feet distant; but that there was no lantern, or other signal of danger, upon the west side of the excavation. The plaintiff alleged in his declaration as follows:

"Plaintiff further avers that on, to wit, the 23d day of October, A. D. 1911, and for ten years and upwards prior thereto, and for, to wit, five months afterwards, there had been and was, between said parallel tracks extending from said Front street to said Market street a regularly traveled route, over which the general public, on foot, day and night, was accustomed to pass and repass without let or hindrance, and with entire acquiescence, consent, and approval of the owners, officers, agents, operators, and employees of said Pere Marquette Railroad Company; that said traveled route, on the 23d day of October, 1911, and for more than ten years prior thereto, and for five months

thereafter, was open to public travel on foot and was habitually, constantly, and continuously used by the public for public travel, and of which traveled route or way, and of the custom of the public to travel over and thereon, said defendants on the 23d day of October, 1911, and for five years prior thereto, and for, to wit, five months afterward, had full knowledge."

There was evidence to support this averment.

There was a conflict in the evidence whether or not there was a lighted lantern, with a red globe, placed at the westerly side of the excavation, as well as on the easterly side, at the time the plaintiff fell into the excavation. The plaintiff testified that he had known of this path or way from Front street to the bridge, and from the bridge to Market street, and across the bridge, for some time, but that he had not passed over the same for a month, or a month and a half prior to the occasion when he received his injury, and that he did not know of the excavation.

His own version of the accident was to the effect that it was a dark, cloudy night; that as he went off the east end of the bridge he noticed one red light and knew that it was a signal of danger; that he continued to approach the light, walking cautiously along for a distance of nearly 100 feet from the place where he first saw the light, when he suddenly fell into the excavation; that the lantern threw no light whatever on the opening of the hole; and that he could not see the hole, and could not distinguish between the ground and the hole; that it all looked alike; and that he merely walked right off into the excavation and received severe injury, his right arm being broken at the elbow, and the elbow joint, in fact, destroyed, and he claimed to have received permanent injuries by reason of the fall.

In support of his claim the plaintiff offered in evidence certain proceedings of the common council of the city of Grand Rapids. These were received over

the objection and exception of defendants that the declaration did not allege any right of the plaintiff to travel on the right of way. It is apparent that at the time the resolution was introduced, which appears to have been in April, 1902, there was in contemplation a new bridge, with a draw in it, which was to be approved by the secretary of war; the roadbed was to be raised, necessitating the raising of the grades and approaches of public streets. The railroad company was to construct the approaches under the direction of the city engineer. The third condition of the resolution reads as follows:

"On condition that said railroad company shall construct a sidewalk to be under the control of, and maintained by the city, across said bridge approximately six feet in width; such sidewalk to be guarded by suitable iron railings, and that such railings shall be at least six feet apart, and shall grant to said city of Grand Rapids a permanent right of way under its tracks on its right of way, suitably banked, at least thirty-five feet in width; or said company may, at its option, construct thereunder two adjoining passageways, at least sixteen feet in width to be used as a public street on Island No. 3."

There is some confusion in the record whether this resolution was ever passed, although it appears that the president of the railroad company was probably so informed, as he wrote an acceptance which assumed its passage, and a bond was submitted which was referred to the committee on ways and means. There is no evidence that a report of this committee was ever made, nor does it appear that the roadbed had been raised, or the new bridge built under the resolution. This evidence was followed by other evidence on behalf of plaintiff, that the city engineer's office, during three or four years prior to the injury, had replanked the bridge, and at some time before the injury the city marshal had repaired this space between the guard rails on the bridge. It does not

clearly appear when the first planking was done, although it may be inferred from the testimony of one of the defendants that it was done by the railroad company when the bridge was built some 12 or 15 years ago. From the evidence tending to show that men in the employ of the city had relaid and repaired the planking on the bridge, and that to the knowledge of the defendants hundreds of people were in the habit of passing over the bridge and right of way daily, it was the claim of the plaintiff that he, with the public generally, was a licensee, rightfully upon the right of way, and with the license of the railroad company, and such seems to have been the view of the trial court. That an implied permission existed finds support in *Brinilson* v. *Railway Co.*, 144 Wis. 614 (129 N. W. 664, 32 L. R. A. [N. S.] 359).

The undisputed testimony shows that near the east end of this railroad bridge upon the right of way of the company, and close to the point where the plaintiff was injured, the railroad company had kept and maintained, for at least 3½ years before this injury, a substantial board sign. It was set on a post, was painted, was about 18 by 20 inches in size, and read as follows: "Private property; no thoroughfare; keep off."

The case was submitted to the jury, and in its charge, among other things, the court used the following language:

"I charge you, as matter of law, that, if you find the Pere Marquette Railroad Company's right of way between Front and Market streets on the west side has been used by the public openly and continuously for a number of years immediately preceding this accident, and if you further find that the Pere Marquette Railroad Company allowed the city of Grand Rapids to build or maintain a sidewalk on the bridge, which is a part of the above-mentioned right of way, from Front to Market street, previous to and at the time of this accident for the purpose of accommodat-

ing the public and at this time (the time of this acci-
dent) and for some time prior thereto the public had
been using the footwalk or sidewalk on this bridge
in passing to and fro from the east to the west side
over this railroad bridge, and using the right of way
of the Pere Marquette Company to get to the first
public street at either end of the bridge, then you
shall find that the plaintiff at the time of this accident
had the right to use the said bridge, and also the right
to use the approaches to the said bridge including the
place where this accident occurred.

"I will add to that by saying as matter of law that,
under the circumstances of this case, the plaintiff
would be a licensee there; he was there substantially
by permission. He had no right or interest in the
property, and the railroad company owed him no obli-
gation such as if he had owned the property or was
upon a highway, a public highway, or place where he
had a right to be, other than they would owe to a
person who was upon their right of way as invited
or as a licensee. Under the circumstances in this
case, in other words, the city put the sidewalk or foot-
walk upon the bridge; that is, they rebuilt it, accord-
ing to the testimony. I do not know whether they put
it there in the first place or not. Evidently with the
consent of the Pere Marquette Railroad Company; if
not with their consent, under the conditions they must
have known, or they will be charged with knowing,
that the public was walking back and forth on that
footbridge, to and across the bridge and from the
bridge on either end, for the accommodation of the
public. So that while the public had no right in the
property, as a matter of license or leave, the Pere
Marquette Company had, either affirmatively or by
tacit consent, granted the privilege to people to walk
at this particular place, the public to walk over the
right of way of the Pere Marquette Railroad Com-
pany at this particular place. So that the plaintiff at
the time and place of this accident, was not a tres-
passer in the ordinary acceptation of the term.

"If the defendants dug, or caused to be dug, an ex-
cavation on the right of way of the Pere Marquette
Railroad Company between Front street and Market
street, on October 23, 1911, at a point that the public
had been openly and continuously using for some time

immediately prior thereto, and this fact, if it is a fact —namely, that the public was using said right of way as above stated—was known to the defendants, then it was the duty of defendants to give a warning of said excavation.  In determining what constitutes a sufficient warning you have a right to take into consideration the fact that trains were using the right of way, the size and condition of the excavation, the condition of the surroundings, and the darkness of the night at the time of the accident."

'  The plaintiff recovered a verdict and judgment of $4,765 damages, and the defendants, after moving for a new trial upon the ground that the verdict was against the clear weight of the evidence, and the denial thereof, which denial was duly excepted to, have brought the case here upon writ of error, and have assigned many errors.

1. It is the first contention of the defendants that the plaintiff was a trespasser upon the premises; but it is also urged that if he was a licensee there could be no recovery in the case.  A careful reading of the record satisfies us that the court was not in error in holding that the undisputed evidence in the case showed that the plaintiff was a licensee upon the premises.  The language of the courts has not been uniform in expression as to the rights of a licensee, or whether a licensee has any rights upon the premises.

In *Clampit* v. *Railway Co.*, 84 Iowa, 71 (50 N. W. 673), the court, in speaking of a plaintiff upon premises, under a license, said:

"Plaintiff, therefore, was not a trespasser upon the railroad track, but is entitled to all the rights and protection of one rightfully upon it with the license of the defendant."

It is the claim of the plaintiff, and we think the claim is supported by authority, that, even if the plaintiff was a licensee, defendants owed him the duty of exercising ordinary care in the protection of this

excavation. The approaches to the walk on the bridge and the walk itself had been continuously, openly, and constantly used for years, it must be said, with the permission and acquiescence of the railroad company, and the defendants' rights can certainly be no greater than those of the railroad company. At the easterly end of the bridge, extending to Market street and over this excavation, was a well-defined path which had been there for years. This path to the walk on the bridge had been openly and constantly used, and as many as 500 people were using it daily. This must have been known to the railroad company, whose offices were in that immediate vicinity, and whose employees, the evidence shows, were constantly using this way as a passage, and the evidence shows that the fact was known to the defendants; and while the general rule is that a licensee ordinarily takes the property over which he passes as he finds it and is subject to its risks, yet there are certain exceptions to this rule. If a licensee has been using a well-defined path openly and continuously, we think he takes only such risks as have existed during the time of using the same; but this does not extend to additional risks on said path made afterwards by the licensor, and without the knowledge of the licensee. In other words, if the licensee has been using a defined path for a length of time with the knowledge and permission of the licensor, then, if the licensor interferes with said path by making it more dangerous, he should give notice to the licensee, or guard the dangerous place so made. We think this doctrine is clearly recognized by this court in *Habina* v. *Electric Co.*, 150 Mich. 41, at page 49 (113 N. W. 586, 13 L. R. A. [N. S.] 1126). In that case a child had been injured; but, unlike this case, it did not appear that any path or way was shown to have existed at or over the land where the ditch in which the child was injured was opened. In that case it was distinctly

found that it did not appear that the plaintiff ever traveled over the premises in a path or way in a direction used by any one else, or that she twice pursued the same way herself, but that she and others had been in the habit of roaming over the entire premises. Justice OSTRANDER said:

"The rule, or exception to the rule, stated in *Felton* v. *Aubrey*, 74 Fed. 350, 20 C. C. A. 436, relied upon by counsel (see, also, *Green* v. *Railway Co.*, 110 Mich. 648 [68 N. W. 988]) that—

" 'If with knowledge that such person will (or may) avail himself of the license, the owner actively change the situation by digging a pitfall, or opening a ditch, or obstructing dangerously the premises which he has reason to believe will be traversed by his licensee, sound morals would seem to demand that he should give reasonable warning of the danger,'

—is limited, and was substantially limited in application in *Beck* v. *Carter*, *supra*, to cases where the use is 'definite, long, open, and continuous.' "

See, also, *Beck* v. *Carter*, 68 N. Y. 283 (23 Am. Rep. 175). We invite attention to the language of Judge Lurton in *Felton* v. *Aubrey, supra; Barry* v. *Railroad Co.*, 92 N. Y. 289 (44 Am. Rep. 377) ; *Byrne* v. *Railroad Co.*, 104 N. Y. 362 (10 N. E. 539, 58 Am. Rep. 512). In the last-cited case the court points out the distinction between the duty owed to a licensee who goes upon a place in its existing condition, and one who has been accustomed to be on that place, and using the same as a definite place, but which definite place has been changed subsequently by the licensor, and the court holds that the licensor must, in such latter case, give notice of the change. See, also, *Corrigan* v. *Sugar Refinery*, 98 Mass. 577 (96 Am. Dec. 685) ; *Toomey* v. *Sanborn*, 146 Mass. 28 (14 N. E. 921). In *Stevens* v. *Nichols*, 155 Mass. 472 (29 N. E. 1150, 15 L. R. A. 459), the court says, quoting from Judge Holmes in *Reardon* v. *Thompson*, 149 Mass. 267 (21 N. E. 369), as follows:

" 'The general rule is that a licensee goes upon the land at his own risk and must take the premises as he finds them.' "

It further says:

"The licensor has, however, no right to create a new danger while the license continues"—citing *Oliver* v. *Worcester*, 102 Mass. 489 (3 Am. Rep. 485); *Corrigan* v. *Sugar Refinery, supra; Corby* v. *Hill,* 4 C. B. (N. S.) 556.

We call attention to the cases cited by Justice HOOKER in *Green* v. *Railway Co., supra,* viz.: *Townley* v. *Railway Co.,* 53 Wis. 626 (11 N. W. 55); *Reifsnyder* v. *Railway Co.,* 90 Iowa, 76 (57 N. W. 692); *Clampit* v. *Railway Co., supra,* and reported in 84 Iowa, 71 (50 N. W. 673). This last is a strong case, citing many authorities.

*Davis* v. *Railway Co.,* 58 Wis. 646 (17 N. W. 406, 46 Am. Rep. 667). This is a well-reasoned case and reviews the American and English authorities at great length, and it is worthy of a careful reading. The doctrine of the case is that there is a clear distinction between the care which a railroad company is bound to exercise, between mere trespassers, and those who are on its right of way by license of the company, and in case of the long and constant user of such way a company and its servants are charged with notice of it, and cannot neglect precautions to prevent danger to persons traveling thereon, and that a wilful injury is not the only ground of liability in such a case. In that case the defendant left a boiler and pile driver unattended for more than half an hour, and an explosion occurred injuring the plaintiff, and the court held that it was a question for the jury whether such negligence was the cause of the explosion, and whether leaving such boiler unattended in the vicinity of the place where defendant's servants knew people would be passing was want of ordinary care towards them; that, while a licensee assumes a

risk incident to the business of the company whose way he uses, yet, if injury be caused by negligence of the company, he may recover therefor. See, also, *Wheeler* v. *Terminal Co.*, 66 Mo. App. 260; *Brinilson* v. *Railway Co.*, *supra.* In the last-cited case the court recognized the general rule that a licensor owes no duty to a licensee except to refrain from acts of affirmative negligence rendering the premises dangerous. See, also, *Graves* v. *Thomas*, 95 Ind. 361 (48 Am. Rep. 727). In that case the court held that when the public have, by permission, traveled on foot for years over an open city lot, it was the duty of the owner, upon making an excavation in the pathway, with a view of erecting a building thereon, to put some guard or warning for public protection, and the failure to do so gave a right of action to one who, without fault, was injured thereby. See, also, *Penso* v. *McCormick*, 125 Ind. 116 (25 N. E. 156, 9 L. R. A. 313, 21 Am. St. Rep. 211).

We might cite many other cases from other States, but we refrain from doing so.

We think the rule may be stated that, after granting a license to use the premises, the owner cannot, lawfully, by his affirmative action, change the premises so as to make them more dangerous, without notifying the licensee of that fact, or warning him of the added danger. *Sylvester* v. *Bookcase Co.*, 169 Mich. 340 (135 N. W. 337).

We think that the cases cited are clearly distinguished from *Ryan* v. *Towar*, 128 Mich. 463 (87 N. W. 644, 55 L. R. A. 310, 92 Am. St. Rep. 481), and similar cases. We are of opinion that the court did not err in submitting this question to the jury.

2. We are of opinion that the question of plaintiff's contributory negligence was one for the jury, and was properly submitted.

3. We do not think the trial court erred in denying the motion for a new trial. There was the posi-

tive testimony of at least two witnesses on behalf of the plaintiff that there was no light at the west end of the excavation. There were three witnesses on behalf of defendants who testified that such a light was placed there, and the testimony of one of them at least tended to show that the light was burning there at the time of the injury, and remained burning all night until 6 o'clock the next morning. Where two witnesses testify to one state of facts and three testify to another, we cannot say, as matter of law, that the verdict was against the clear weight of the evidence. We have spoken so recently upon this subject that the cases need not be cited. The most that can be said is that it was a close question upon the facts.

4. This brings us to the argument of counsel to the jury which was complained of in defendants' fifth assignment of error. Upon the argument of the case by plaintiff's counsel he used the following language:

"I want to call your attention to something just before I pass this. We have introduced in evidence here the contract. This contract calls for $356,722 for building the sewer, and it specifies there what must be done; specific, everything that must be done. Carpenter and Anderson, of course, they figured on the 25 per cent. for material, perhaps—I don't know just the per cent.—10 per cent. or 50 per cent. for labor, and 10 per cent. for depreciation of machinery, and something for accidents. They figured on this, this very thing here, and it is made a part of this $356,000. Let me read to you. So they are meeting just what they figured on.

"*Defendants' Counsel:* I except to counsel's reference to anything of that kind in this contract.

"*Plaintiff's Counsel:* The contract is in evidence and we can read it.

"*The Court:* Counsel for defendants may have an exception.

"*Plaintiff's Counsel:* 'The contractor shall be liable at all times for damages to person or property due to improper protection of the work.' Above that I will read the whole article on the subject: 'The

contractor shall erect suitable railings or barriers and shall provide watchmen on the work, if required, and if it is necessary for the safety of the public.' And if necessary, barriers and red lights shall be maintained and kept to protect the public, and if there is any damage, the contractor is responsible for it. That is a part; they figured on that in order to get their estimate, how much they can do the work for.

"*Defendants' Counsel:* I take an exception to the argument counsel has made since I called attention to it. I desire to have a ruling, to know there is a ruling of the court on the matter.

"*The Court:* Counsel may take an exception and have the benefit of a ruling, that the counsel making the argument takes his chances on that being error. Counsel for defendants may have an exception to the argument."

If we understand the scope and meaning of the argument of plaintiff's counsel, it was to the effect that any verdict which the jury might render against the defendants was, after all, only for a sum of money for which they were already indemnified, and which was to be paid to them by the city under the contract, for the express purpose of paying such claims as the plaintiff's in this case. It is true that the contract between the city and the defendants had been put in evidence by the plaintiff to show that the defendants were doing the work under the contract with the city, and to show such portions of the contract as might have any bearing upon the duty of the defendants toward the plaintiff. The liability of the defendants in no way depended upon the amount which they were to receive under their contract. Manifestly, the price paid for this work was immaterial to the issue in this case. It was also immaterial whether anything was included in the contract for accidents, even if there had been any evidence that such item was included. There was, however, no such evidence. We think this argument was unwarranted, and may have been, and probably was, very damaging to the defendants.

Such argument would have a tendency to induce the jury to conclude that the defendants were already indemnified against any damage which they might award the plaintiff. That such language was reversible error has been frequently held by this court. The case was a close one on some of its facts and required, not only the caution of counsel, but the scrutiny of the court, upon the course pursued in the argument. We have looked for any reference in the charge to the subject and failed to find it. *Kerr* v. *Manfg. Co.*, 155 Mich. 191 (118 N. W. 925) ; *Person* v. *Shingle Co.*, 160 Mich. 1 (124 N. W. 522) ; *Hughes* v. *City of Detroit*, 161 Mich. 283 (126 N. W. 214, 137 Am. St. Rep. 504), and cases cited; *Antosik* v. *Alkali Co.*, 166 Mich. 415 (132 N. W. 80) ; *J. H. Worden Lumber, etc., Co.* v. *Railway Co.*, 168 Mich. 74 (133 N. W. 949), and cases cited; *Rauhala* v. *Maki*, 172 Mich. 112 (137 N. W. 703).

We think the language used under the circumstances, and the fact that it was in no way cured by the charge of the court, was highly prejudicial to the rights of the defendants, and amounted to reversible error. If counsel persist in making such improper arguments, they must take the consequences resulting therefrom.

By defendants' sixth assignment of error complaint is made that again during the closing argument of plaintiff's counsel he used the following language:

"Give him what you think he is entitled to. Give him what you think he ought to pay his nurse. Is $10,000 too much? Would you fall in that sewer for $10,000 and take your chances; would you go through life that way? Would you have your son go through life that way? Uneducated boy, what can he do?

"*Defendants' Counsel:* I except to that line of argument.

"*The Court:* Just a moment, counsel may have an exception to the argument of counsel for the plaintiff."

No allusion was made in the charge to this improper argument of counsel. With reference to similar language, Justice MCALVAY, in *Hughes* v. *City of Detroit, supra,* at page 289, said:

"That this argument above quoted was inflammatory and prejudicial is apparent. It was cause for reversal. *Ward* v. *Reed,* 134 Mich. 392 (96 N. W. 438) ; *Hillman* v. *Railway,* 137 Mich. 184 (100 N. W. 399)."

For the errors above pointed out in the argument of counsel and the course taken relating thereto, we are constrained to reverse the judgment of the court below and grant a new trial.

Judgment reversed, and a new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.