# OCTOBER TERM, 1914.*

WELLS *v.* ANN ARBOR RAILROAD CO.

1. CARRIERS—NEGLIGENCE—STATIONS—PASSENGERS.

Where defendant provided no approach to its station except along the track, and no lights or means of signaling its motor cars, and plaintiff, who understood the conditions existing, on an evening about 8:30, after dark, came to a small station to take the car home, signaling to it as it approached, and was struck when about half the length of the car had passed her, where, on cross-examination, she admitted that she was about two feet from the track and the car was shown to have extended 24 to 30 inches over the rail, her recovery was barred by contributory negligence, under a declaration which failed to count upon any theory of discovered negligence. KUHN and MOORE, JJ., dissenting.

2. SAME—TRIAL—OPENING STATEMENT.

Since it is, as a rule, improper to argue the facts or the legal questions in a case in making the opening statement to the jury, the attorney for plaintiff erred in stating as a part of his opening, that the defendant owed to the public the responsibilities and duty of maintaining as an approach to its station the portion of its track and roadway that the public habitually passed over to reach the station, and that the defendant owed to her the same degree of care which it owed to a passenger, and should have exercised the highest degree of care of which human foresight is capable, with other argument along similar lines.

3. SAME—ARGUMENT—MISCONDUCT OF COUNSEL.

It was also improper and prejudicial to argue to the jury, in closing his case, which one of them would suffer plain-

---

tiff's injury for a stated sum, or ask them what they would consider they ought to have if the wife of one of them was so injured.

Error to Livingston; Miner, J. Submitted October 12, 1914. (Docket No. 70.) Decided January 4, 1915. Rehearing denied January 29, 1915.

Case by Gertrude E. Wells against the Ann Arbor Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed; new trial denied.

*Gustavus Ohlinger* and *Shields & Shields* (*Alexander L. Smith,* of counsel), for appellant.

*W. P. Van Winkle & Son* and *Odell Chapman,* for appellee.

OSTRANDER, J. Upon the line of the defendant road, and a few miles north of Howell, on the east side of the track, is a platform made of cinders, confined on each of the four sides by timbers. It is 6 feet wide east and west, and 15 feet long. There is no building, and stops there are made by gasoline cars only, and only upon signal or to discharge passengers. It is called Preston. The line runs north and south here, crossing an east and west highway some 240 feet north of the platform on a bridge elevated some 13 feet above the highway, and the land south of the highway adjoining the defendant's right of way is called the Layton farm. The highway referred to is fenced, and the right of way is fenced on both sides. The buildings on the Layton farm are west of the right of way and about a quarter mile south of the platform at Preston. Members of the Layton household and some neighbors, for convenience, reached the platform by a journey through the fields of the farm to an opening in the right of way fence, coming

onto the right of way 810 feet south of the platform, traveling thence up the right of way. The only other route from the Layton house is north on a highway to the east and west highway above mentioned, along the east and west highway east to the right of way, and down the right of way south to the platform. No means of access to the right of way from the highway had been provided. It was gained only by climbing from the highway to the elevation of the right of way or by climbing a fence or fences. Having gained the right of way from either direction, no course to the platform was prepared or indicated by defendant, intending passengers using such portion of the right of way as suited convenience.

Plaintiff, a woman 71 years old, lived in Howell; her daughter lived on the Layton farm. Upon two occasions in 1913 prior to the one in question here, plaintiff had used the defendant's gasoline motor car to visit her daughter, alighting at the Preston platform, and on her return taking passage at the platform. To and from the platform she used the defendant's right of way and the route across the fields. In this manner she reached her daughter's house on the morning of July 31, 1913, and in the evening left the house alone to return to Howell by the car due at Preston at 7:04 p. m. Later she was joined at the platform by her daughter, who had noticed that the car had not gone south. It was concluded that the plaintiff should return to the house and remain the night, and some 300 feet on the trip down the track to the house had been accomplished when they heard the whistle of the approaching car. Turning, they observed the headlight of the car then crossing the bridge over the Shiawassee river 2,200 feet north of the platform. Retracing their steps, plaintiff and her daughter again approached the platform, walking rapidly, the car, or its light, being all of the time in

full view, and plaintiff, as it neared her, making signals by waving her handkerchief as she walked. The daughter reached the platform and from there signaled the car, using her kitchen apron, which was light brown in color. The car did not stop. Plaintiff claims to have been struck by it 80 feet south of the platform, after about half the car had passed her. The car stopped 352 feet south of the platform, to which place plaintiff and her daughter walked. The train crew offered to take her on board, carry her to the platform, the Layton farm gate, or to Howell. She declined to ride, and the car went on. This occurred about 8:30 p. m., and it was dark. Plaintiff's description of what took place is, in part, as follows:

"*Q.* During the time it was coming straight on this stretch of track you could see the headlight all the while?

"*A.* All the while.

"*Q.* And did you watch it all the while?

"*A.* Yes.

"*Q.* At the same time you were walking rapidly, trying to get up to the platform?

"*A.* Yes. My daughter was a little spryer than myself, and she got to the platform some time before the car got there.

"*Q.* And all the time, as you were going on, you were watching and could see the car coming with the headlight?

"*A.* Yes. When the car got near enough so I could signal I took my handkerchief in my hand and raised it as high as I could. I was still walking toward the platform. The car was coming on down very rapidly. I think the car was running faster than its usual rate of speed between stops. I kept on signaling for the car.

"*Q.* They didn't stop for you?

"*A.* No.

"*Q.* Didn't act as though they saw your signal at all?

"*A.* They didn't—no, they didn't act so.

"*Q.* And the car kept coming so far as you saw it at the same rate of speed, did it?

"*A.* Yes.

"*Q.* Didn't it slacken up before it got to you?

"*A.* No.

"*Q.* Didn't stop at all?

"*A.* No. I supposed it would, but it didn't.

"*Q.* So you don't think it slackened up a particle in answer to your signals before it got to you?

"*A.* No; it didn't.

"*Q.* You are quite sure about that?

"*A.* I am. I am sure of that.

"*Q.* So it was running, when it got up to where you were, it was running as fast, you think, as it had been anywhere?

"*A.* I do.

"*Q.* After you saw it?

"*A.* Yes.

"*Q.* And it was running faster than the usual rate of speed was?

"*A.* Yes.

"*Q.* Where were you on the track when you signaled?

"*A.* I was on the outermost part of the embankment.

"*Q.* Which side of the rails?

"*A.* On the east side of the rails.

"*Q.* With which hand were you signaling?

"*A.* With my right hand. As I was going towards the platform I was on the east side of the east rail, and I was signaling with my right hand, and I was going as rapidly as I could.

"*Q.* The headlight was burning, was it?

"*A.* Yes.

"*Q.* So you could see it plainly? It came along at a speed faster than usual and didn't stop at all?

"*A.* No.

"*Q.* As it came to you? Are you quite sure they didn't slacken up?

"*A.* I am.

"*Q.* There can be no doubt in your mind?

"*A.* No, not a particle.

"*Q.* Then as they came along there to you, you still had your right hand up signaling, didn't you?

"*A.* Yes.

"*Q.* Did you keep your hand up signaling until after the car struck you?

"*A.* Until it struck me. I guess I was about three rods south of the platform when the car struck me. I don't know how the car struck me. I was as far from the east rail as I could get, without going down the embankment—should think I was 8 feet from the east rail, but I am not sure. That was my position while I was signaling.

"*Q.* And then what part of the car hit you?

"*A.* I can't tell you. I know—I knew nearly half of the car passed me while I stood there.

"*Q.* Before it struck you?

"*A.* Yes.

"*Q.* Had the head of the car, the front of the car, got by you before you were struck?

"*A.* It had.

"*Q.* And what part of your body did the car first strike?

"*A.* I couldn't tell you. It was done so suddenly I don't know what happened.

"*Q.* You think something about the middle of the car struck you?

"*A.* I guess so.

"*Q.* In the excitement there did you step toward the car?

"*A.* No.

"*Q.* As it went by you?

"*A.* No.

"*Q.* How do you explain that the side of the car somewhere struck you, and not the front end of it?

"*A.* I can't explain it.

"*Q.* You haven't any explanation?

"*A.* No.

"*Q.* Can you figure it out in any way what it was that could have struck you there?

"*A.* No.

"*Q.* You are quite sure you didn't step toward the car?

"*A.* I am; certainly I am.

"*Q.* Did you have your left hand extended toward the car?

"*A.* No; my left hand was— I had my handbag on it, and it was in about this position.

"*Q.* Which side of your body was struck by the car, do you know?

"*A.* Why, it was the front of the body that was struck by the car, and the arms.

"*Q.* Was it your left arm and left hand, or your right arm and right hand that was first struck by the car?

"*A.* I don't know. I suppose it must have been this one [indicating to right arm] because that would have been likely to have been the one, but I guess they were both done very near together, in about the same instant.

"*Q.* As the car was coming down there, you stood facing it, didn't you, you stood facing the north?

"*A.* Yes, I guess I faced the west a little, expecting they would stop.

"*Q.* The car was coming from the north?

"*A.* Yes.

"*Q.* So that you stood there by the rail, or eight feet away from it, as you say; your right shoulder would be away from the car, wouldn't it, and your left one be closer to the car?

"*A.* Why, no; I think they were about the same. I think I was nearly facing the car.

"*Q.* You were nearly facing the car?

"*A.* Yes.

"*Q.* But which shoulder would be nearer the rail as you stood looking north facing the car?

"*A.* Why, I was facing west to look at the car, because the car was going south.

"*Q.* The car was coming from the north, wasn't it?

"*A.* Yes, coming from the north.

"*Q.* So in order to be watching the car, as you stated, seeing the headlight all the while, you would have to be turned looking toward the north. wouldn't you?

"*A.* No, looking to the west.

"*Q.* Then you would be facing the west?

"*A.* Yes.

"*Q.* Would you turn your head to look up the track to the north to see a car coming?

"*A.* No; I had been until the car was just to me, and then I faced the car.

"*Q.* Until the car got down, the headlight got right down to you, then you had been facing the north?

"*A.* I had been facing the north.

"*Q.* As it got right next to you, then you turned so you were facing the west, and facing the car as it went by you?

"*A.* Yes, sir.

"*Q.* And you don't know which shoulder was struck first?

"*A.* I think it must have been this one, but they were done both so quickly [indicating to the right side].

\*       \*       \*       \*       \*       \*

"*Q.* Now, as you came along up the track, had you the whole distance walked as far away from the east rail of the track as you were?

"*A.* Yes.

"*Q.* So the whole distance up you had kept about eight feet outside of the track and parallel with it?

"*A.* Yes.

"*Q.* So that the walking there was reasonably good for eight feet?

"*A.* Yes.

"*Q.* East of the east rail of the track?

"*A.* Yes.

"*Q.* And you felt that it was probably safer and just as convenient walking as to walk between the rails, didn't you?

"*A.* Yes.

"*Q.* So the roadbed for about eight feet on the side of the rail was reasonably level and pretty good walking all the way from the Layton gate up to the platform?

"*A.* Yes.

"*Q.* And where you were hit, it is your judgment that the side grading there for about eight feet or more east of the east rail was reasonably level, and so you could walk there all right?

"*A.* Yes.

"*Q.* You said something about some dirt, or ditch, or dirt, that was farther back and away from where you had been walking?

"*A.* Yes.

"*Q.* And wasn't any obstruction at all to your walking?

"*A.* No.

"*Q.* And wasn't in the way at all for your stepping out far enough to keep away from the car as it came along for at least eight feet through there?

"*A.* Yes."

After a noon recess, plaintiff, on redirect examination, testified:

"*Q.* Mrs. Wells, you said something about eight feet from the car when it struck you. Since going to dinner, have you thought that testimony over?

"*A.* I have. I think I overestimated the distance; that that wasn't eight feet, or I wouldn't have been hit.

"*Q.* Has anybody explained to you that a car didn't extend over the track more than some 24 to 30 inches, something like that?

"*A.* They have.

"*Q.* Who was it did that?

"*A.* Mr. Chapman.

"*Q.* Learning that fact and knowing you got hit, how far do you think you must have been from the track, now?

"*A.* Probably two feet. I didn't move toward the train or try to catch onto it. One-half the car had passed, I think, before I was hit. I had not moved towards the car at all. I was in a somewhat dazed mental condition by the shock. I presume it was about a quarter of an hour before I was fully possessed of my faculties. I presume I got into full possession of my faculties before I went down to Mrs. Layton's but I am not sure of that."

As to the speed of the car, the testimony of the daughter agrees with that of the mother. The car did not slow down before it passed the station. It was so dark that each could distinguish the other's form, but not her face. The daughter in going back to the platform traveled outside of and on the east side of the rails. The going there was good. The steps for

entering the car were on the side, and perhaps half way down the car from the ends.

It is alleged in the declaration to have been the duty of defendant to build, erect, and maintain a safe and convenient way by which the general public and plaintiff could reach the said station and stopping place, to stop its motor car on signal at the usual stopping place, and permit plaintiff to take passage thereon, to light the premises with sufficient light in the nighttime so that persons taking the usual way to approach the station could be seen by the engineer, and so that signals to stop could be seen. As it was known to defendant, and consented to, that persons went to the station from the south along the rails or ties; that this was the only way to the station from the south; that defendant had provided no way to approach the station from any direction except over and along its tracks—it became and was the duty of defendant to use care and caution not to collide with any one approaching the station, and not to approach the station in a rapid manner, but to have its car under control, so that it could be stopped without running by the station, and to be on the lookout for persons approaching the station; it owed to plaintiff the particular duty when signaled not to run its car by the station, but to stop it at the usual place and not to run it 300 feet beyond and to the south of the station, colliding with plaintiff; it owed a duty to provide some mode of signaling in the dark. Breaches of these duties are alleged. At the conclusion of plaintiff's case, defendant moved for a directed verdict in its favor and, the motion being denied, offered no testimony.

Appellant discusses the exceptions taken at the trial and the objections to the charge under the heads, Misconduct of Counsel, Errors in the Introduction of Evidence, Improper Argument to the Jury, Errors in

Charging and in Refusing to Charge the Jury. One ground of the motion for a directed verdict was that plaintiff had shown herself to be guilty of negligence which contributed to her injury, another, which was also the ground of numerous objections to the testimony offered by plaintiff, was that the failure of defendant to maintain approaches to the platform was an immaterial fact. The failure of defendant to maintain approaches and to light the station are among the facts stated by plaintiff's counsel in opening the case to the jury, in which opening statement the duty of the defendant in this behalf is asserted and plaintiff's claimed rights in respect thereto were stated. Counsel said in part:

"Now, gentlemen, we call your attention and the court's attention at this time to this proposition of law: That this way that they have discharged their passengers over and received them over was an approach. It was an approach, the public had a right to treat it as an approach, and they owed all the duties and responsibilities of an approach, and if they run negligently over that, they might as well have an approach, coming off here, and then run some death-killing machine over that, as to have run over this approach with a train. Now, gentlemen, the moment Mrs. Wells went through that gate, if your honor please, and onto this place, that was an approach, and had been used for an approach, and the moment, gentlemen of this jury, she became a passenger of the defendant, that the defendant owed her the duty of a passenger, and that is, gentlemen, in the management of their trains. It was their duty to manage them safely. They owed the highest degree of care of which human foresight, under all the circumstances, is capable. Now, I want to call your attention here so you will understand the case. This is not any complaint that the approaches were not sufficient. What we shall say about the approach is only for the purpose of showing you, gentlemen of the jury, that Mrs. Wells was justified in using this as an

approach. The proximate cause of the injury, we contend, was the Ann Arbor Company running its train over this approach and not stopping when it was signaled at the proper place, but they ran over this approach when persons were using it to come to the place where it had invited them. When they did that, they violated that high duty that the law of our country imposes upon this railroad corporation when it allows them to engage in this business which is for the purpose of profit. It says, In doing those things, you shall handle them safe. It doesn't say 'reasonably safe' or 'ordinary care,' but it says 'safe,' and upon this proposition they told Mrs. Wells just as much as though they had handed her a paper.

*"Mr. Shields:* I take exception to the argument.

*"Mr. Chapman:* I withdraw that. They owed her the duty when she stepped upon that place; they said to her, 'This is safe;' that 'we will insure you that you do not get hurt by us on account of our negligently managing our trains.' "

The court advised the jury that it was the duty of the defendant to provide a reasonably safe and convenient means to reach the station, not having done which, plaintiff was rightfully upon the right of way; that it was defendant's duty to keep a sufficient lookout to discover whether there were persons at the station signaling the car, and if it was so dark that such persons could not be seen, to slow the speed of the car so that it could stop it if necessary; that if they found that signals were given upon this occasion and defendant did not regard them and ran its car until it struck the plaintiff, and plaintiff was without negligence, she could recover. The jury was also advised that if plaintiff had time to get out of the way "after she had realized that the car was not going to stop at the station" she could not recover unless defendant was guilty of gross negligence. Thereafter the court instructed the jury upon the subject of gross negligence, applying the doctrine in this wise:

"And if said engineer did actually see Mrs. Layton [the daughter] when she was signaling the train to stop, as she has testified, and saw Mrs. Wells approaching the station in the manner in which she has described, within a distance where, by the use of reasonable care, the engineer could have stopped his car, and he saw there was danger of running his car against plaintiff or so near her that the plaintiff might be struck, then said defendant would be guilty of gross negligence, and plaintiff would be entitled to recover, whether she was guilty of contributory negligence or not."

In argument opposed to granting the motion for a directed verdict one of the counsel for plaintiff said upon the subject of gross negligence:

"In the first place, your honor, the defendant was guilty of gross negligence in not lighting its premises so the motormen could have seen persons congregating at the platform and signaling them. There is no presumption, by myself at least, that a motorman would be so malicious, so wanton, so calloused to every touch of humanity that he would want if he saw these women there signaling and saw them signaling at the regular passenger station, it can't be that he is such a monster that he wouldn't have stopped. He undoubtedly didn't see them because the railroad company had neglected its duty to light the premises, and if your honor please, and if he couldn't see them and he knew that was a place where people approached the crossing, he knew that a party had gone up, or the defendant knew that a party had gone up there that morning from Howell and would naturally want to take the train back to Howell that night, and if he couldn't see whether people were congregating there to take it or not, he owed a duty to be careful, according to the circumstances, and approach that crossing with his train under control, and that is alleged as one of the duties he owed in these premises. They are guilty of gross negligence, if your honor please, in not protecting their passenger, who was seeking to take passage upon the train, by proper conduct. First, by lights; second, by not approaching

their station as they ought to; and, third, your honor, in colliding with the woman at all."

No theory of discovered negligence of defendant is indicated by the declaration. These considerable references to the record are made to show how wide a range the testimony took and how many subjects were covered by the charge of the court, when in fact the real issue was a narrow one. No one disputes the right of plaintiff to go, as she did go, to a place upon the platform which was defendant's place to stop its gasoline cars to take on and discharge passengers. If defendant had maintained a safe and convenient way from the north to the platform, the fact might have been shown, perhaps, as affecting the right of the plaintiff to be where she was, but as affecting the defendant's negligence, it was immaterial, because it was not on account of the absence of such a way that plaintiff was injured; she did not approach the platform from the north, and did approach it by the convenient way across the farm and from the south. Yet it is plain that considerable was made of the fact that approaches to this platform from both directions were not maintained. Again, considerable was made of the fact that the platform was not lighted and provided with some means of signaling a car. Reference to the time-table, Exhibit M, discovers that no car was scheduled to stop at Preston at an hour when, in the summer season, a light would be necessary or even convenient. It is assumed that these matters probably affected the jury, since it is clear that the injury was the result of plaintiff's carelessness.

Assuming that defendant was negligent in any, or in all, of the respects alleged in the declaration, the injury cannot be reasonably ascribed to its negligence. Plaintiff knew the car was late; that the night was

dark; that the platform was not lighted; that no means of signaling the car had been provided. She tried, properly enough, to signal the car. She wanted to go home. But it is obvious that she had no occasion to place herself in a position of danger, and equally obvious that the conditions, as they appeared to her, did not invite her into a place of danger. She was in no danger except from the moving car. There was every evidence that it would not stop at the platform. If the motorman saw the signals, and saw her, but, for any reason had determined not to stop at this station, he could not suppose that she would stand, or walk, so near the car as to be struck by it. Unfortunate as the affair was, it is clear that plaintiff's want of ordinary care contributed, at least, to the result. For this reason the court should have granted the motion for a directed verdict.

Errors were committed by counsel for plaintiff in making the opening statement to the jury and in the closing argument. The rule was violated in opening the case to the jury. A proper opening statement to a jury is neither an argument of the facts nor a discussion of the law of the case.

A proper closing argument does not permit counsel to ask the jury which one of them would accept the injury plaintiff is alleged to have suffered for a stated sum of money, or, in a case like this one, to ask a juryman what he would think it worth if plaintiff was his wife. Although admonished by the court, counsel repeated and elaborated such appeals to the jury.

Counsel, apparently in good faith, defends his action in closing the case, and this is the reason for doing more than merely advert to the subject here. He directs our attention to the opinion in *Detroit, etc., R. Co.* v. *Van Steinburg*, 17 Mich. 99, 119, where it is said, in effect, that in determining whether an injured person did or did not act prudently, in view

of circumstances presented to him, the jury must place themselves in the position of the injured person and examine the circumstances as, at the time, they were presented to him. This is a long ways from the position that, in estimating the damages which should be awarded for a particular injury, the jury may fix such sum as they would be willing to accept and suffer the injury, or such sum as they would accept if a wife or other member of the family was so injured. Counsel should not ask a jury to adopt this rule for awarding damages because it is not the true rule. If a court were to advise a jury that such a rule should be followed, the error would be immediately apparent. See, among other cases holding that the argument was reversible error, *Morrison* v. *Carpenter*, 179 Mich. 207 (146 N. W. 106) ; *Hughes* v. *City of Detroit*, 161 Mich. 283 (126 N. W. 214, 137 Am. St. Rep. 504).

No new trial will be granted.

BROOKE, C. J., and MCALVAY, STONE, BIRD, and STEERE, JJ., concurred with OSTRANDER, J.

MOORE, J. I think the questions involved were for the jury, and that, except for the argument of counsel, the case should be affirmed, but because of the argument it should be reversed.

KUHN, J., concurred with MOORE, J.