SCHWAGER v. SAGINAW PLATE GLASS CO.

1. MASTER AND SERVANT—GUARDING OPENINGS—NEGLIGENCE.

Where decedent's master had been accustomed in using air hose at its factory to lay the hose across its passageway that decedent went through to leave the factory, and where he and other men had frequently ridden on their bicycles along the passageway, defendant owed no duty to the servant to furnish a safe way for the use of the laborers so as to make it liable for injuries resulting in the death of its servant, where his bicycle skidded against the air hose laid diagonally across the passage as it had been placed for about two days in the ordinary course of business to the knowledge of decedent, throwing him into an open pit from which the railings or guards had been removed for necessary repairs.

2. SAME—CONTRIBUTORY NEGLIGENCE.

If the defendant was in any sense negligent for leaving the engine pit into which the deceased employee fell, unguarded, the latter was guilty of contributory negligence for failing to act with the caution which the apparent conditions, of which he had actual notice, required of him to protect himself from injury.

Error to Saginaw; Kendrick, J. Submitted January 20, 1914. (Docket No. 103.) Decided March 26, 1914.

Case by Wilhelmina Schwager, as administratrix of the estate of Henry R. Schwager, deceased, against the Saginaw Plate Glass Co. for the unlawful killing of decedent. Judgment for plaintiff, and defendant brings error. Reversed.

*Humphrey, Grant & Humphrey,* for appellant.

*Frank A. Rockwith (R. L. Crane,* of counsel), for appellee.

OSTRANDER, J. ' When plaintiff rested her case, a motion was made by defendant for a directed verdict, in denying which the learned trial judge said:

"In this case it seems that the negligence complained of by the plaintiff against the defendant comes close along the line of that notorious condition which was under the common observation of any person who was in that locality. Yet there are certain conditions surrounding it that lead the court to think that perhaps there were facts there that the deceased was not as familiar with, as I recollect the testimony. As to how often he visited the locality, and what attention he gave it, is not apparent in the testimony. What is complained of as to the surroundings being unguarded and of a hazardous character, they were of a character that, it seems to me, the defendant would have knowledge of the hazardous character unless properly guarded. This place was not properly guarded at the time of the injury to the deceased; the conditions had been changed, and the guards that had been provided by the defendant had been moved, and were, if hazardous, continued dangerous at the time of the accident. That, of course, would not bind the company if the plaintiff had actual knowledge of the condition surrounding. If the conditions there were such that any person should have known, and would have known, all of the situation and surroundings, then the mere fact that the defendant did not guard these pit holes would not render them liable, nevertheless. But I am inclined to think that this is a question, perhaps, that should go to the jury and they take the responsibility. While I confess it is a very close case, it is not as clear to me as the vision of the attorneys on either side. I feel it my duty to deny the motion. The defendant may have an exception."

Some testimony was introduced by defendant, and the motion for a directed verdict was renewed and overruled with the statement:

"The negligence, the only thing that should be submitted to the jury, is simply negligence in the way they handled that rail. Had he fallen over and struck

himself against the rail, I think he would have had no remedy whatever, and would have been barred."

Two principal acts of negligence on the part of defendant are alleged in plaintiff's declaration: One, a failure to guard by a railing a sunken engine pit in the power room of the plant; the other, the leaving of an air hose lying upon the floor, over which plaintiff's intestate traveled. As to the presence and use of the air hose, the court instructed the jury:

"I charge you concerning the surroundings which have been explained to you, and which have been prominently in consideration in the trial of this case, that it has been the fact that the railing was removed from a portion of the front of these pits, as has been described to you, and concerning certain air hose. Now, I have stated to you that it is the law, and properly so, that a party entering the employment of another assumes the natural risks incident to the business; and concerning the hose, I charge you that it appears in the evidence in this case that this air hose is oftentimes in constant use in and around this factory, and was used by coupling the hose with the air at some place in that portion of the building, and then again at some other place where the air was being used in the building, and that was one of the methods used by the defendant in the operation of its factory, and that this means or method of operation had been in use since the time that the factory was constructed and put in operation; and I charge you, gentlemen of the jury, that the defendant is guilty of no negligence in the use of this hose and in the operation of this factory in the usual and ordinary manner in which the same was operated."

Assuming that the jury followed the instructions given them, they then found the defendant negligent in not having at the time a guard along the floor at the engine pit. Upon this subject, in all essentials, the testimony is undisputed, and the manner in which plaintiff's intestate was injured is related by an eyewitness, called by the plaintiff.

Plaintiff's intestate was the electrician in defend-

ant's plant, where he had been employed for upwards of ten years. He was 35 years of age. His bench and cupboard for his tools were in the machine shop, and his duties called him into practically all parts of the factory. Considerable of defendant's machinery was operated by electric power. The machine shop has a direct entrance from outside the building by means of large doors. It may also be entered from the power room. In the power room, sunk below the level of the floor, were engines operating polishing machines and perhaps other machines; the polishing machines being set at some distance from the engines which operated them, with a floor space between, the application of power being below the level of and through a space under the floor. One passing along the floor in this part of the power room had engines, in pits, on one side, and polishing machines on the other; the floor space being some six feet wide and a hundred feet and more in length. Turning off from this passageway at right angles, was a narrow floor space, 10 or 12 feet long, between engine pits, which ended at the door giving entrance to the machine shop. At some time during the interval of three years before the occurrence in question, iron railings had been erected in the floor on three sides of the engine pits; the fourth side being the wall of the building. A space three or more feet wide was left open in each case for an entrance to the pit. To prevent water running from the floor into the engine pits, the defendant undertook to build around each a brick coping, higher than the floor, into which the iron guard railings were to be set. The work of so protecting pit called No. 2 was begun some two weeks or more before plaintiff's intestate was injured; the railings being removed and the laying of the brick coping begun. No temporary railings were used, and, because the masons who began the work were called to

perform duties in some other part of the plant, the work which otherwise would have been completed remained incomplete. Three days or more before plaintiff's intestate was injured, a workman had been directed to do something near engine No. 2 which required the use of the air hose, for the attachment of which various places existed in the room; the hose being almost constantly in use. The hose was laid along the floor from the place where it was attached, and in this case it was attached three feet above the floor in the narrow passage running to the machine shop door heretofore described, and was laid upon the floor out to the main passage and diagonally across it. The hose remained on the floor for several days. Plaintiff's intestate habitually, in fair weather, rode a bicycle in going to and from his work. Instead of placing it in a rack provided by defendant for that purpose, he took it into the machine shop where he had his bench. Instead of entering the machine shop through the main doors provided for the purpose, he entered it from the power room. Instead of walking through the power room, and leading his wheel, he rode his wheel across it some 200 feet along the floor between the engines on one side and the polishing machines on the other until he came to the narrow passageway mentioned, into which he turned, at the end of which was the door into the machine shop. In quitting work he followed the same course. He brought his wheel from the machine shop into the narrow passageway, mounted it, rode a few feet in the passageway, turned at right angles, and proceeded upon and along the floor of the power room to the entrance thereto. He so rode his wheel into the plant on the mornings of January 18 and 19, 1911, and on and over the air hose on the floor. He attempted to ride it out, upon quitting work, in the evening of January 19th. The room was well lighted with elec-

tric light.  As he turned the corner out of the passage-
way, riding slowly, one wheel of his bicycle came in
contact with the air hose, the bicycle skidded, he was
thrown over and into the pit of engine No. 2, and
his arm was badly injured.  He had been told by a
superior employee of defendant, who, however, had
no supervision over or control of him, or his work,
that it was a dangerous thing to ride through the
power room on his wheel, because other employees
were using the floor, glass was being carried along it,
and he was likely to cause injury to himself and to
defendant's property.

Describing the way plaintiff's intestate received his
injury, the person who saw it said:

"Well, Mr. Schwager, he got his wheel and walked
to the machine shop door with his wheel, got on the
wheel, and started off.  And as he went to make the
bend he just got nicely on his wheel, and he went to
make the bend, and there was an air hose lying be-
tween No. 1 and 2 pit, and as he went to turn his
wheel, on the angle, struck the hose and threw him
into the pit; his wheel going on one side of the pit and
him landing on the other side.   *   *   *

"Q. And how far did he ride on the wheel before it
struck this hose?

"A. Well, I should judge about 10 or 12 feet, pos-
sibly 15.

"Q. And about how far had he got around the
corner here, the first corner that he made?

"A. Well, he hadn't got turned around there at all;
he was just near it; the front wheel was just coming
around.  The wheel hadn't passed the corner entirely.

"Q. So the middle of the wheel would be about op-
posite that corner?

"A. Yes.   *   *   *   It was the air hose that I have
just mentioned that throwed the wheel into the pit.
There was other hose about pit No. 2 at that time
besides this one air hose.  There was water hose;
there was water hose all around there; that was right
there in the bannister."

This witness testified, also, that he saw plaintiff's

intestate ride over the air hose at least two days and that it had been lying on the floor for four or five days; that the hose was in constant use about the factory, "as it was this day, lying on the floor." Except that the railing had been removed from about the pit of engine No. 2, all witnesses say that conditions were as usual and as they had been for years. The railings were made of gas pipe and were three feet above the floor, supported at intervals by standards or uprights of the same material.

Plaintiff appears to have claimed something on account of the fact that a considerable number of the workmen passed over the floor of the power room, that some of those who rode wheels carried the wheels into the shop, and that plaintiff's intestate rode his wheel through the power room frequently, so often that some person or persons in authority ought to have seen him do it, and he was not forbidden the practice. The defendant's factory usually runs day and night, with two crews of men. The testimony is very indefinite as to what man other than plaintiff's intestate rode a wheel through the power room. There was some testimony which tended to prove that two others did so. Just where they rode them, to what point, or points, is not clear. However favorable to plaintiff this testimony may be supposed to be, it is evident that plaintiff's intestate ought to have learned from his experience the conditions existing there and the use which was habitually made of the air hose. It is said in the brief for plaintiff that—

"Deceased went by this pit the same as others, and, if the several hundred persons continually passed to and fro while the rail was down, it would be of force that deceased did as the others, and that is the test of due care."

And again:

"Deceased assumed the risks incident to his em-

ployment as an electrician. No one would anticipate defendant would make this common passageway needlessly and negligently dangerous for him. That it was in that condition for all passers is too plain for question. There is no assumption of risk in this case."

Several hundred people did not continually ride bicycles through this room, and I find nothing in the record to support the proposition that the defendant undertook to maintain a way through it for the use of persons riding bicycles.

I know of no principle of law which supports the idea that because plaintiff's intestate was not forbidden to ride his bicycle in the building, or was not discharged from service for riding it, he therefore acquired the right to a safe way for riding. He was performing none of the duties of his employment when he was riding through the room, but was consulting his own convenience. Upon the facts, the case is not one for the application of the doctrine that the master must furnish the servant a safe place in which to perform his work. Assuming that the defendant knew the habit of plaintiff's intestate, and that he had tacit permission, or was licensed, to use the place as he did, defendant laid no trap for him. It did not dig a pitfall or dangerously, or in an unusual manner, obstruct or change the way traversed by him. In the regular course of its business, it was remedying a defective condition, in doing which it removed a railing from an engine pit. In the regular course of affairs, an air hose had been left by a workman on the floor. And plaintiff's intestate must be presumed to have known of the absence of the railing; must be presumed to have accepted the risk of riding once more over a hose that he had passed over for two days, and perhaps for a longer time. It is incredible that he could have suffered the injury if he had walked along the floor.

I am of opinion that defendant, as matter of law,

failed in the performance of no duty which in the circumstances it owed to plaintiff's intestate. Other considerations bring me to the same result. The testimony permits no one to fairly say that the presence of the railing would have averted the injury, and, if it was negligent for defendant to leave the engine pit unguarded and to permit the air hose to remain upon the floor for so long a time, the evident failure of plaintiff's intestate to act with reference to known, or observable, conditions plainly contributed to his injury.

The judgment is reversed, and, as upon plaintiff's theory there can be no recovery, no new trial is granted.

McALVAY, C. J., and BROOKE, KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.