## BONER v. EASTERN MICHIGAN POWER CO.

1. MASTER AND SERVANT—EXISTENCE OF RELATION—DINNER HOUR
   —DEFECTIVE INSTRUMENTALITY—LADDER.

   Where plaintiff was doing construction work about the
   plant of the Au Sable Electric Company, and was em-
   ployed by defendant power company, he was not engaged
   in duties incident to his employment at the noon dinner
   hour, when he had no property or particular service of
   the master in charge, and had taken his dinner pail and
   started to climb a ladder to eat his lunch upon the boilers.
   The breaking of the ladder was not such an accident
   resulting from defendant's negligence as would render it
   liable to a workman after he had ceased his employment
   to seek a place for the said purpose.[1]

2. SAME—CESSATION OF EMPLOYMENT—ELECTRICITY.

   Though the injured party remained upon the premises
   where he was employed, the relation of master and ser-
   vant did not continue, as he was at liberty to go wherever
   or do whatever he pleased.

3. SAME—DIRECTING VERDICT—LICENSE—DUTY TO LICENSEE.

   The injured party was a mere licensee as to the company
   that had allowed him in its plant, and, as to his employer,
   there was no ground upon which he could recover against
   it, unless the possession of the construction company was
   such that its control, and that of the power company
   which owned the plant, could be said to be joint.

4. SAME—SUBMITTING CASE TO JURY.

   Plaintiff could not rightly recover against either defendants
   above mentioned on the theory that the relationship of
   master and servant existed at the time, but the court
   should have submitted the issue to the jury whether or
   not a duty was owing to plaintiff as a licensee, by either
   of the defendants.

[1]The question as to whether relationship of master and servant
still exists where servant goes upon master's premises before,
after or between hours of actual labor, is discussed in notes in
12 L. R. A. (N. S.) 853; 23 L. R. A. (N. S.) 954; 49 L. R. A.
(N. S.) 162.

5. SAME—EVIDENCE.

> Evidence by another servant that he notified the assistant superintendent of the power company that the rung of the ladder was loose and would turn, charged the other defendants with no duty. He was in no way connected with them. There was no evidence of notice which would charge them.

Error to Jackson; Parkinson, J. Submitted October 10, 1916. (Docket No. 91.) Decided December 21, 1916. Rehearing denied September 27, 1917.

Case by Edwin Boner against the Eastern Michigan Power Company, the Au Sable Electric Company, and the Grand Rapids-Muskegon Power Company for personal injuries. Judgment for plaintiff against the two first-named defendants who bring error. Reversed.

*Bernard J. Onen* (*Wilson & Cobb*, of counsel), for appellants.

*Price & Whiting*, for appellee.

STONE, C. J. This is an action on the case, brought by the plaintiff against the Grand Rapids-Muskegon Power Company, the Au Sable Electric Company, and the Eastern Michigan Power Company, to recover damages for injuries sustained by him in a power plant in the city of Grand Rapids, on February 7, 1912. The plant in which the plaintiff was injured was owned by the Grand Rapids-Muskegon Power Company. It is claimed that the plant was in possession of and operated by the Au Sable Electric Company. The Eastern Michigan Power Company was doing certain construction work in and about said plant. The plaintiff was an employee of the Eastern Michigan Power Company, but not of the other defendants.

The trial court directed a verdict in favor of the Grand Rapids-Muskegon Power Company, and submitted the case to the jury as to the other defendants.

The jury rendered a verdict in favor of the plaintiff for $2,258 against both of the remaining defendants, upon which a judgment was thereafter entered.

The plant in which the plaintiff was injured was in operation at the time. There were eight boilers in the boiler room, four of which had been there for some time, and four had been put in during the summer prior to plaintiff's injury. They were large boilers. Plaintiff testified that a person who desired to go on top of them would be obliged to go up a ladder somewhere from 20 to 25 feet. The room in which the boilers were located consisted of only one story. One of the means provided for reaching the top of the boilers was an iron ladder fastened to, and parallel with, the west wall of the building, and about 4 or 5 inches therefrom, and extending to a height of about 25 feet. This ladder was constructed of iron, the sides being flat pieces of iron and the rungs consisting of hollow pieces of pipe through which long bolts were run and fastened to the sides of the ladder on either side by nuts, which, when tightened, held the side pieces against the rungs so that they would not turn. The ladder was fastened to the wall with bolts or lag screws, and was located about 4 or 5 feet from the boiler nearest the west wall. The ladder in question had been up for six weeks or two months before the plaintiff was hurt.

The plaintiff alleged in his declaration, and was permitted to show by himself and other witnesses, that the employees were accustomed, and had been for some time, to go up on top of the boilers for the purpose of eating their dinners. On the day that the plaintiff was injured, and for two or three days prior thereto, he had been working on the outside of the building, and not upon the top of the boilers. It was cold weather at the time and he was dressed in working clothes and wore leather faced mittens, sometimes by him

called "mitts," upon his hands. At the time the plaintiff was hurt he was going up the ladder referred to for the purpose of eating his dinner on top of the boilers. He was hurt about half past 11 o'clock a. m. He testified that his hours for work commenced at 6:30 o'clock in the morning and continued until 11:30 o'clock when he ate his dinner, and after dinner he went to work at 12 o'clock and continued until 5 o'clock p. m. The wages which he received for his work were paid at the rate of 25 cents an hour. The record shows that no witness was present at the time plaintiff was injured. He testified that he started up this ladder with mittens on his hands and his dinner pail in his left hand. He couldn't state whether he had the bail of the pail in his left hand or on his arm, and couldn't recollect how he did hold it. He claimed to have had hold of the rung with his right hand and his dinner pail in the other, and that, when he took hold of the rung to pull himself up, the rung turned and broke his hold, and he fell to the floor 15 or 16 feet, and was severely injured. He testified:

"Well, I was going up that day and I got about 15 or 16 feet up the ladder and as I grasped the round with my right hand and went to raise myself to the other step, the round rolled and I fell over backwards. I couldn't catch myself with the other hand. I fell on the floor and injured myself, broke my arm and my wrist, and put it out of place, and injured my shoulder."

On cross-examination the plaintiff testified:

"No, I couldn't get as good a grasp on the round with the hand with the mitten on as I could if I had been barehanded.

"*The Court:* What were those mittens made of, cloth mittens?

"*A.* I think it was a cloth mitten with leather face.

"*Q.* If your hand had been warm, Mr. Boner, and you had used your bare hand in going up that ladder

you could have put your hand around the round couldn't you?

"*A.* I could have put my hand around the round.

"*Q.* If you would put your hand around the round, even if it turned it couldn't break your hold, could it?

"*A.* No, not if I had grasped clear round the round, but any one climbing a ladder doesn't stop to place the hand around each round in just such a position it can't turn.

"*The Court:* Had any of those rounds ever turned or indicated they were loose when you had previously used them?

"*A.* I don't remember of that round being loose before.

"*Q.* Any of the rounds up there?

"*A.* None of the rounds.

"*Q.* The last time before this was the day before you had used it?

"*A.* Yes, sir.

"*Defendants' Counsel:* Mr. Boner, if I understand it, you had been up and down that ladder repeatedly, and the last time, the day before this accident, with perfect safety?

"*A.* I had been up there, and always went up and down safe all right.

"*Q.* You had repeatedly used that ladder, and the last time the day before the accident, and had never discovered a loose round in the ladder?

"*A.* I had never noticed the round being loose.

"*The Court:* Had you ever gone up there with those same mittens on?

"*A.* I had not."

He testified that he had gone up the ladder each day for two weeks prior to the time that he was injured, and he didn't remember of any rung in the ladder being loose when he had previously used it. He testified, however, that he might have seen that it was loose and still not thought of it, because the ladder could have been climbed all right if the rung were loose.

All of the other witnesses sworn upon the trial of the case who had used this ladder, except the witness

William Boner, never discovered any loose rung in the ladder until after the plaintiff's accident. The witness William Boner, brother of plaintiff, testified that the rung in the ladder was loose when it was installed, and that he had informed one Mr. Hottinger, the assistant superintendent of the defendant Eastern Michigan Power Company, of that fact. This testimony was denied by Mr. Hottinger, but the question became one of fact and was submitted to the jury.

The room in which the boilers were located was a large one, and the boilers were set through the center of the building, leaving a space in front and in back of the boilers about 15 feet in width and 40 feet in length. In this space there were benches used by the pipe fitters, and the employees were accustomed to gather around these benches at noon for the purpose of eating their dinners.

The plaintiff claimed that the defendants were negligent:

"(a) In failing to furnish plaintiff a safe place in which to work, or to keep the premises in a reasonably safe condition, or to use reasonable care and diligence in the construction of said ladder in order that the same might be reasonably safe for plaintiff and other employees to make use of in passing up and down, to and from the top of said boilers.

"(b) In failing to use due diligence in inspecting and looking after said ladder to see that the same was kept in a reasonably safe condition of repair.

"(c) In placing said ladder in position, leaving one of the rounds loose and the bolt that ran through same not securely drawn up and tightened, so as to prevent the said round from rolling and turning over.

"(d) In allowing the said round in said ladder to be and remain in that condition for a considerable length of time, to wit, for a number of weeks prior to the happening of the accident to the plaintiff."

The case has been brought here upon writ of error by the defendants, the Eastern Michigan Power Com-

pany and Au Sable Electric Company, and there are many assignments of error. We shall not discuss many of the assignments of error, for the reason that, in our opinion, there are two or three controlling questions in the case which are sufficiently raised by the assignments of error. The following is the allegation in plaintiff's declaration:

"And plaintiff further avers that on the said 7th day of February, 1912, he was climbing up said ladder, with due care and diligence, to go on top of said boiler for the purpose of eating his dinner."

And in support of this allegation he testified as follows:

"*Q.* On this day in question just what were you doing when you got hurt?
"*A.* I was going up the ladder.
"*Q.* For what purpose?
"*A.* To eat my dinner.
"*Q.* What time of day was it?
"*A.* Half past 11."

It is the claim of the plaintiff that at the time of the injury he was in the employ of the defendant Eastern Michigan Power Company. There is no claim on his part that he sustained any contractual relations with the defendant Au Sable Electric Company. The testimony of the plaintiff is uncontradicted that he had fixed hours of work, and that his wages were paid by the hour.

We have examined the record with care, and are satisfied that it appears unquestioned that at the time the plaintiff was injured he was performing none of the duties of his employment, but was consulting his own convenience in seeking a place to eat his dinner. In our opinion, under the authorities, the relation of master and servant did not exist at the time of this injury between the plaintiff and the Eastern Michigan Power Company; he was acting on this occasion of his

own volition, and, in our opinion, the rule that where a servant sustains injuries while attempting, without authority, to do something not within the scope of his employment, he cannot recover under the circumstances as disclosed in this case. It cannot be said that he was in said defendant's employment or in the proper discharge of his duty, and he voluntarily sought this place of his own motion. We think this view is supported by the following authorities: *Schwager* v. *Glass Co.*, 179 Mich. 360-367 (146 N. W. 171); *Moronen* v. *McDonnell*, 177 Mich. 691-697 (143 N. W. 8); *Spooner* v. *Detroit Saturday Night Co.*, 187 Mich. 125 (153 N. W. 657, L. R. A. 1916A, 17); *Hutchinson* v. *Iron Co.*, 141 Mich. 346 (104 N. W. 698).

In 4 Thompson on Negligence, § 3748, it is said:

"As a general statement of doctrine, it may be said that to render a master liable as such for an injury resulting from a breach of his duties to his servant, it must appear that the injured servant was at the time of the injury acting within the scope of his employment. A larger statement of the same principle is to say that in order to hold a master liable for personal injuries to a servant, it must appear that the servant was at the time of the injury engaged in the service of the master, or going to, or from such service, and not acting for some purpose of his own, or going into some place where it was not proper or necessary that he should have been."

See, also, 26 Cyc. p. 1241; *Ellsworth* v. *Metheney*, 104 Fed. 119 (44 C. C. A. 484, 51 L. R. A. 389), and cases there cited; *Mitchell-Tranter Co.* v. *Ehmett* (Ky.), 65 S. W. 835 (55 L. R. A. 710); *Dickinson* v. *Railway Co.*, 177 Mass. 365 (59 N. E. 60, 52 L. R. A. 326, 83 Am. St. Rep. 289); *Wilson* v. *Railway Co.*, 130 Ky. 182 (113 S. W. 101).

It has been sometimes said that if the injured party remains upon the premises the relation of master and servant continues, but that alone is not sufficient.

Where the injured party, as here, was at liberty to go wherever and do whatever he pleased, and was not in charge of any of his employer's property, nor under his orders, the employee is for that time dismissed from the service. Baldwin Personal Injuries (2d Ed.), § 374.

The cases of *Broderick* v. *Depot Co.*, 56 Mich. 261 (22 N. W. 802, 56 Am. Rep. 382), and *Adams* v. *Iron Cliffs Co.*, 78 Mich. 271 (44 N. W. 270, 18 Am. St. Rep. 441), cited by plaintiff, are readily distinguished from the instant case, for in the *Broderick Case* at the time the plaintiff was injured he was actually performing a service for the defendant. In the *Adams Case* the employee's duties were numerous, and he had other men under his charge, and if at any time while he was on defendant's premises any need of his services had arisen, it was his duty, under his employment, to have at once stopped and given such services.

In the instant case the plaintiff had fixed hours, fixed wages paid by the hour, and, so far as the record shows, was not required to perform any service until he had eaten his dinner and had returned to his work. As we have already said, there is no claim on the part of the plaintiff that he was in the employ of the defendant Au Sable Electric Company.

The evidence is quite indefinite as to the exact time when the plant had been turned over by the defendant Eastern Michigan Power Company to the defendant Au Sable Electric Company, or whether or not it had been fully turned over at any time. It may possibly be said, although the evidence upon the subject is not clear, that there was a joint possession of the plant by both defendants. It is therefore clear to us that the plaintiff cannot recover in this case upon the theory that at the time of his injury the relation of master and servant existed as between him and either of the

defendants. In our opinion the plaintiff was a mere licensee at the time of his injury.

The court, among other things, charged the jury as follows:

"If you do not believe the evidence as to the round being loose, at the time the ladder was put up, then there is no evidence in the case as to how or when it became loose, and therefore there is no evidence whereby you can find negligence on the part of either defendant, and your verdict in that event would be for the defendants."

The jury, having rendered a verdict in favor of the plaintiff, against both defendants, must have based the same upon the testimony of the witness William Boner. The plaintiff being a mere licensee, there can be no liability on the part of the defendant Eastern Michigan Power Company unless it still had some control over said plant and premises. As we have shown, there was some testimony on the part of William Boner that the rung was loose at the time the ladder was put up, and that he notified Mr. Hottinger of that fact. Mr. Hottinger was the assistant superintendent of the Eastern Michigan Power Company, and had been in the employ of that defendant for a period of three years. He sustained no relation with the Au Sable Electric Company. Any notice to him would have been no notice to that company. There is no evidence in the record that notice of any defect in the ladder had been brought home to the defendant Au Sable Electric Company. The duty which these defendants owed to the licensee was fully discussed by us in the case of *Morrison* v. *Carpenter*, 179 Mich. 207, at page 216 (146 N. W. 106, Am. & Eng. Ann. Cas. 1915D, 319 *et seq.*). We there referred to the case of *Habina* v. *Electric Co.*, 150 Mich. 41 (113 N. W. 586, 13 L. R. A. (N. S.) 1126), and that of *Felton* v. *Aubrey*, 74 Fed. 350 (20 C. C. A. 436), and a large

number of other cases. See, also, *Murch Bros. Construction Co.* v. *Johnson,* 203 Fed. 1 (121 C. C. A. 353) ; *Ellsworth* v. *Metheney, supra.*

In our opinion this case should have been submitted to the jury upon the theory that if there was any liability on the part of either of these defendants to the plaintiff, it was because of the duty owed to him as a licensee. Without evidence of notice or knowledge on the part of the defendant Au Sable Electric Company of a defect in this ladder, which had been purchased of reputable manufacturers and placed in position by the other defendant, there could be no recovery as to the defendant Au Sable Electric Company. And unless the defendant Eastern Michigan Power Company was still so far in control of the plant as that its possession might be considered a joint one with that of the defendant Au Sable Electric Company, there could, in our opinion, be no recovery against that defendant. Neither defendant can be said to have "laid a trap" for the plaintiff unless said defendant was in charge of the plant, and knew of the condition of the ladder.

The case having been submitted to the jury upon an entirely different theory, we think the verdict cannot be sustained as against either defendant. The judgment of the court below is therefore reversed and a new trial granted, with costs to the appellants.

KUHN, OSTRANDER, MOORE, STEERE, and BROOKE, JJ., concurred. BIRD and PERSON, JJ., did not sit.