THE INDIANAPOLIS AND ST. LOUIS RAILROAD CO.

*v.*

LUTHER MILLER.

1. RAILROAD CONTRACTORS — *the company promising the laborers employed to see them paid if they will work.* Where the laborers employed by contractors and sub-contractors in the construction of a railroad quit work, from an apprehension that they will not be paid, and are about to mob one of the principal contractors, and the president of the railroad company goes to the place where the mob is assembled, and in a speech to them says: "Go back to your work, and I will see that you are paid," and one of the sub-contractors is present and hears the speech, this does not constitute a contract between the railroad company and such sub-contractor that the company will pay such sub-contractor for any work he may do on the railroad.

2. The most that could be said in such a case, even if the language used by the president was intended to apply to such sub-contractor, would be that the company should pay such sub-contractor for the work done by him, according to the terms of the contract existing between the railroad company and the principal contractor, and between the principal and the sub-contractor.

3. In such a case, the sub-contractor could in no event recover from the railroad company any more than he would be entitled to under his contract with the principal contractor, and if the mode of measurement of or estimating the work done is fixed in the contract between the company and the principal contractor, the sub-contractor, as against the company, will be bound by it, although his sub-contract may provide for a different mode.

4. SAME—*abandonment of, not established by the fact that the company keeps time of and pays the laborers.*  Where a contract between a railroad company and a contractor for the construction of the road provided that the contractor should be liable for the payment of the wages of his laborers, and when, in the opinion of the president of the company, it should be necessary to secure the laborers, the president should pay them, and their receipts should be a sufficient voucher against the contractor, as so much paid on the contract, and the president of the company, in order to prevent the laborers quitting work, promised to see them paid, and thereupon appointed a timekeeper to keep the time of the laborers, and paid all the hands laboring on the road, including those employed by sub-contractors, it was *held,* that this was not an abandonment of the contract between the company and the contractor, and that if the company was liable to the sub-contractors for any work done by them or their men, the amount of the liability would be measured by the original contract.

5. INSTRUCTIONS—*should be based on the evidence.*  An instruction which tells the jury that if a certain fact exists, virtually tells them that there is evidence from which they can find that fact; and if there is no such evidence, the instruction is calculated to mislead the jury, and is erroneous.

6. PRINCIPAL AND AGENT—*effect of statements made by agent in the absence of his principal.*  The statements made by an agent in reference to the matter of his agency, and within the scope of his employment, are binding upon the principal, although made when he was not present.

7. PRACTICE—*counsel in argument should not get jurors to make memoranda to take with them to the jury room.*  Courts should not countenance the practice of permitting attorneys, in arguing a case, to have jurors take down with pencil and paper his calculations of amounts, and to permit such memoranda to be taken to the jury room to be used in finding their verdict.  It may be that a juror, of his own motion, may make memoranda of evidence or of points in an argument, but it should not be at the instance of counsel.

APPEAL from the Circuit Court of Christian county; the Hon. HORATIO M. VANDEVEER, Judge, presiding.

Mr. S. W. MOULTON, and Mr. M. A. OSBORN, for the appellant.

Messrs. HENRY & PENWELL, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The company, in 1869 and 1870, were engaged in building a railroad from Indianapolis to Terre Haute, in Indiana.

Tenny & Wright contracted to construct a portion of the work. Their agreement with the company was in writing, and the company was bound to pay therefor on monthly estimates. The contract provided that Tenny & Wright were to be liable for the payment of wages to their laborers, and when, in the opinion of the president of the company, it should be necessary to secure the laborers, the president had authority to pay them, and their receipts therefor should be sufficient vouchers against Tenny & Wright, as so much paid on their contract.

Appellee became a contractor with Tenny & Wright, to do the work on three sections of the road, being 40, 41 and 42, and, as such sub-contractor, commenced work thereon. Some time afterward, the laborers on other portions of the road became apprehensive that they would not get pay for their labor, quit work and went to Greencastle and attempted to mob Tenny, when Morris, the president of the road, came to Greencastle and addressed the men, and said to them: "Go back to your work, and I will see that you are paid." It seems that appellee's hands generally remained at work and did not join in the movement to quit. But appellee went to Greencastle, and says he heard the promise, but he does not know that the president knew he was there, and that they, at that or at any other time, had no conference in reference to his working for the road, either as to manner, extent or compensation.

The laborers returned to work, and the company appointed timekeepers and paid all of the hands laboring on the road, including those employed by appellee. He also presented his account for pay for his teams employed on the road, and for his own labor, received payment, receipted for the same without objection, remonstrance, or by any act indicating that he was not fully satisfied with the arrangement. Nor does it appear that he manifested the least dissatisfaction, nor did he claim that the company was liable to him in any other

way, or for anything else, until after the work was all completed.

It appears that Tenny & Wright remained contractors until the completion of the work, and settled with the company. There is no pretense that they ever abandoned their contract, or that the company released or discharged them from its performance. Nor does it appear that appellee abandoned his contract with Tenny & Wright, or that he was ever released or discharged from its performance. but they seem to have increased the price he was to receive for handling earth. by the cubic yard. The work progressed in all things after as before the difficulty with the laborers, except the company kept the time and paid the hands, instead of the contractors. So far as disclosed, the company hired no hands, but that was done by the contractors as before, nor were new contracts let. The old contractors and sub-contractors employed, superintended and managed the work as they had previously.

On a final settlement, it was found that the company had paid out to laborers and contractors over $200,000 more than it came to under the contract with Tenny & Wright; and that more had been paid on the three sections embraced in appellee's contract than it amounted to on estimates on Tenny & Wright's contract, thus leaving no money in the hands of the company belonging to appellee's principals, the first contractors.

On this state of facts, we are totally at a loss to see how it can be held that the promise of the president of the road could be construed into an agreement, express or implied, with contractors or sub-contractors. They were not dissatisfied or threatening to quit work, but it was the men in their employment who were so acting, and it is manifest that the language was intended to be addressed alone to them. Had the difficulty been with the company and the contractors, all know that a different course would have been pursued. The president would have gone to or sent for the contractors and sub-contractors, and the old contracts would have been rescinded

and new ones made with them or others, or modifications made, and whether new ones or modifications had been entered into, the changes would have been reduced to writing.

It is totally incredible that the president ever could have intended to permit contractors or sub-contractors to proceed and charge what they saw proper for labor performed, nor will the language bear such a construction, if the words employed are not tortured out of their meaning. He was addressing common laborers, and not contractors. He made the promise to the laborers to whom he was talking. They had quit work and were attempting to mob a contractor, but there is no evidence that the contractors or sub-contractors had quit. And the language used was : "Go back to your work," not continue work that you have not quit or threatened to quit.

Again, appellee gave to the contract there made by the president with the laborers, its true construction, by presenting his bill for labor performed by him and his teams, and by having his hands receive the money directly from the company instead of from him. He had no estimates made of the earth removed, and presented to the company when he received payment for his labor and for the use of his teams. Had he supposed the contract was what he now claims, he surely would have had his estimates made and presented for payment at each pay day. But he manifested his consciousness that such was not the agreement. From his conduct, it it clear that, although he heard the promise to the men, he did not understand it to embrace him as a contractor, but only as a laborer. And no one can reasonably suppose that the president for a moment understood that the contractors and sub-contractors were embraced in the promise. All know, that to make a contract, the minds of the parties must meet and come to an agreement as to the thing to be done or not done. Here, the language employed, the surrounding circumstances, and the subsequent conduct of appellee, all contradict the inference that the minds of the president of

the company and of appellee came to an accord on what is now claimed as the contract.

Even if Morris intended to include contractors and their sub-contractors in the promise, it could not have been extended beyond the pay they were to get under the terms of their contracts. It could not have abrogated existing agreements. It was not to permit laborers to work and charge what they might choose, but it was simply a guaranty by the president that he would pay them reasonable wages under their contracts with their employers. Not that they should go to work independent of their contractors, and they would be paid what they might see proper to charge. If the language used had been broad enough to embrace sub-contractors, it would have been no more than a guaranty that the principal contractors would pay them, and if they should not, the president would see they were paid according to their agreement. But the evidence shows that Tenny & Wright were overpaid, or rather, the payment of the men, teams, tools, provisions, feed for teams, etc., exceeded their contract over $200,000, and appellee had been paid more than his contract with Tenny & Wright called for, and even more than the estimates entitled them to recover under their contract with the company. It is true, the money, except on two or three occasions, was not paid to him, but directly to his men; so there was nothing owing from Tenny & Wright to appellee to which the guaranty made by Morris could attach. That guaranty was fully performed when all the money was paid to the men which was due them for their labor.

In any view in which we have been able to consider the case, we can not see that the company has incurred any liability to appellee beyond the payment of the men, and this they have done. And, even if Morris had guaranteed payment of what appellee was entitled to receive under his contract, that has been paid in full. Hence, the verdict is manifestly against the evidence.

Appellee, in giving his testimony, stated that he had received, in all, between $21,000 and $22,000, and that if his work had been correctly estimated, it would have come to about $26,000.  He must, therefore, have been surprised when the jury returned a verdict in his favor for $12,000. Even if Tenny & Wright ordered appellant to pay to appellee all that the estimates would give him on these three sections, still he has been, if the evidence is to be trusted, overpaid on that estimate.  But if we were to exclude all the testimony except that given by appellee himself, the finding would be too large by $7000 or $8000.

We have carefully examined appellee's testimony, and fail to find that he threatened or intended to quit work under his contract.  And we are at a loss to see upon what the first and third of appellee's instructions are based.  They say to the jury, if he was about to quit work, and appellant's agent told him if he would go on they would pay him, etc.  These instructions, in this particular, have no evidence on which to base them.  We do not find in the evidence, nor have we been referred to any from which it can be reasonably inferred, that appellee ever intended to quit or abandon work under his contract.  This was well calculated to mislead the jury, as they virtually told the jury there was evidence from which they could find the fact.

They were wrong in allowing a recovery to the value of the work, instead of the price fixed by the agreement between appellee and Tenny & Wright, if they found that appellant had assumed, under their order, to pay it, and any portion remained unpaid.  We fail to find that appellant ever agreed to pay appellee a fair compensation for his work.  The most that can be claimed they agreed was, to pay to the extent they had agreed to pay Tenny & Wright.  These instructions fail to so limit the extent of the recovery, and tell the jury they may allow a reasonable compensation.  We think these instructions misled the jury to find a verdict so much larger

than was claimed by appellee in giving his testimony to the jury.

The second of appellee's instructions does not limit the liability to the extent of the agreement of the company to pay Tenny & Wright, as it should. The fourth instruction for appellee should have been refused, as there was, so far as we can find, no evidence upon which to base it. We find no evidence that appellee did work for the company at their request, or under any contract or agreement, express or implied. All the evidence tends to prove that he performed the labor under his contract with Tenny & Wright.

His fifth instruction is wrong. It tells the jury that if Morris told appellee and others, that if he and they would go to work he would pay them, and put on persons to keep the time of the men, and gave directions as to the performance of the work, and that Tenny & Wright had abandoned their contract, then the jury might, from such facts, infer the work was done for the company, and not as a sub-contractor. When Morris told the men engaged in the mob he would see them paid, it was but reasonable and prudent on his part that he should inaugurate some system by which he could ascertain the extent of liability the company was thus incurring; and, hence, that act did not tend to prove the company had taken charge of the work, to the exclusion of the contractors. And, we apprehend, all contractors, without exception, in constructing railroads, work under the orders and directions of engineers of the company, and if that was done in this case, it did not tend to prove that the company had excluded the contractors, or rescinded their contracts. And we fail to find any evidence from which it can be inferred that Tenny & Wright had abandoned their contract.

The sixth was not properly limited, as it informs the jury that appellee is entitled to the amount Tenny & Wright were to receive, in case they found the facts supposed in the instruction. From that amount, the money paid to his hands and to himself, manifestly, should be deducted, and the instruc-

tion should have so informed the jury. And it should have limited a recovery to the amount Tenny & Wright were to pay appellee.

The seventh of appellee's instructions was calculated to mislead, and no doubt did mislead the jury. It was immaterial what agreement existed, or was entered into, between appellee and Tenny & Wright. It could not bind the company unless they assented to their agreement, and agreed to become bound by it on a sufficient consideration. If the contract of Tenny & Wright with the company provided for a particular mode of measuring the work, they could not bind the company to a different mode by a contract with appellee. He must be governed in that respect by the agreement of his principals with the company, when he is endeavoring to enforce his rights against the company. In a suit between the contractors and their sub-contractors, the rule would be different.

The eighth instruction given for appellee informs the jury, that if the chief engineer had no personal knowledge of the correctness of the estimates, and his knowledge was derived from assistants, and their reports were not produced on the trial, or their absence accounted for, then the jury may disregard his estimates entirely. On turning to his deposition, as copied into the record, we find he swears he made the estimates on appellee's work, and he nowhere states that he made them on reports from others; but if he did, his estimates must be presumed to be correct until it is shown they were incorrect. There is no evidence showing that the work was measured by another competent engineer and found to be incorrect. And as he was, by the contract, to make the estimates for the parties, his calculations must govern until they are shown by measurement or estimate to be incorrect.

The eleventh instruction is based on the refusal of appellee to go on with his contract, when we have seen there was no evidence tending to prove he refused, or ever gave notice that he intended to cease work. This was, as we have seen,

wrong, and should have been refused. And the twelfth instruction is liable to the same objection. The ninth is too general. If an agent was acting for appelleé in keeping the time of his hands, statements made by him in reference to that matter, and within the scope of his employment, these declarations would bind appellee, although he was not present. And the tenth might well have been refused, as not applicable to the evidence.

The damages are excessive beyond all reason. It is manifest that appellant paid all of appellee's hands, including himself and teams, and for provisions furnished to his hands, and feed for their teams. Then, for what should he recover, on any theory of the case? Surely, only for the profits, if any, on his contract over and above the money paid for the labor in constructing the work, or for his personal services. In either view, there could be no very large sum due, if any weight be given to the evidence. If for profits, the weight of the evidence shows there were none. If for personal services, then there were. at most, but six or seven months he claims he labored for appellant. Again, the court below should not countenance the practice of permitting attorneys, in arguing a case, to get jurors to take paper and pencil to take down his calculations of amounts, and to permit such memoranda to be taken to the jury room to be used in finding their verdict. It may be that a juror, if he desire it, may make, on his own motion, memoranda of evidence, or even of the points of argument of counsel, but it should only be done on the motion of a juror, and not by counsel.

For the errors indicated, the judgment of the court below is reversed, and the cause remanded.

*Judgment reversed.*