**CHICAGO & N. W. RY. CO. v. KELLY.**
No. 10465.

Circuit Court of Appeals, Eighth Circuit.
July 14, 1936.

Alfred E. Rietz, of St. Paul, Minn. (William T. Faricy, of Chicago, Ill., and Warren Newcome, of St. Paul, Minn., on the brief), for appellant.

Ernest A. Michel, of Minneapolis, Minn. (Tom Davis and Carl L. Yaeger, both of Minneapolis, Minn., on the brief), for appellee.

Before GARDNER, SANBORN, and BOOTH, Circuit Judges.

SANBORN, Circuit Judge.

On October 24, 1932, at about half past four in the morning, at Carroll, Iowa, Paul C. Kelly, the appellee (plaintiff), a brakeman in the employ of the appellant (defendant), was injured when the wheels of a tank car ran over his left leg, requiring its amputation 8 or 9 inches below the knee. The car was included in a freight train moving in interstate commerce, and was the fourth car behind the locomotive. The train left Council Bluffs, Iowa, at about 1:15 a. m. October 24, 1932, for Boone, Iowa. At its point of origin, the train consisted of about 20 cars. Its first stop was Missouri Valley, Iowa, where 46 additional cars were added to the train, being placed ahead of the original 20 cars. The three cars behind the locomotive were box cars destined for Carroll, Iowa. The train's next stop was Denison, Iowa, where 8 cars were set out. It then proceeded to Carroll, 72 miles beyond Missouri Valley and 28 miles beyond Denison. At Carroll it headed in on the eastbound passing track for the purpose of letting a passenger train go by and to set out the 3 head cars. The freight train stopped at the coalhouse to

refuel the engine. It then proceeded forward upon the passing track. Kelly, who was head brakeman, was riding the engine. It was his duty to uncouple the 3 head cars which were to be set out. In order to do that, he would be first obliged to go between the third and fourth cars, after the train had stopped, for the purpose of turning the angle cocks on the air line and disconnecting the air hose. Kelly left the engine while the train was moving 4 or 5 miles an hour and at a point where he claims he thought the uncoupling operation was to be performed, or, in other words, at a point which he estimated would leave him at the rear of the third car when the train came to a stop. It was dark at the time, and he had his lantern with him. He claims that, as the third car passed him, he realized that it would not stop at the point expected, and that he then attempted to mount the side of the third car near the rear end by grasping with both hands the handhold there located, at the same time placing his right foot in the stirrup; that the handhold came out at its forward end and threw him down with his left foot across the rail; that the train then moved about 60 feet before it stopped. Kelly brought an action under the Federal Employers' Liability Act, § 6 (U.S.C. title 45, § 56 [45 U.S.C.A. § 56]), alleging a violation of the Federal Safety Appliance Act of 1893, § 4 (45 U.S.C., § 4 [45 U.S.C.A. § 4]), based upon a defective handhold, which he asserted was the cause of his injuries. The defense was that Kelly was injured by going between the cars while they were in motion, in violation of the rules of the defendant railway company. The issues were clear cut and simple. They were: (1) Was Kelly injured because of a defective handhold? (2) If he was so injured, what damages was he entitled to recover? It was conceded that if the accident happened as Kelly claimed, he was entitled to damages, but that if it happened as the defendant claimed, he was not.

The first trial resulted in a verdict in favor of the plaintiff for $20,000. The defendant moved for a new trial, which motion was denied on condition that the plaintiff consent to a reduction of the verdict to $17,000, which was done. There was an appeal by the defendant, who claimed that the evidence was insufficient to justify the verdict, that counsel for the plaintiff was guilty of misconduct, and that the verdict was excessive. This court [74 F.(2d) 31] held the evidence sufficient to support the verdict, but reversed on the ground of counsel's misconduct in injecting into the case the fact that the plaintiff had two children to support. Upon the retrial of the case, the plaintiff had a verdict for $26,000. A motion for a new trial was made and denied, and this appeal followed.

The defendant again asserts the insufficiency of the plaintiff's evidence to sustain the verdict; complains of certain rulings upon evidence, certain instructions of the court, and the refusal of requested instructions; and charges misconduct of plaintiff's counsel in his closing argument to the jury.

■ In so far as the questions arising upon this second appeal are substantially the same as those presented upon the first, they are ruled by our former opinion. 74 F. (2d) 31. American Surety Co. of New York v. Bankers' Savings & Loan Ass'n of Omaha, Neb. (C.C.A.8) 67 F.(2d) 803; Claiborne-Reno Co. v. E. I. Du Pont de Nemours & Co. (C.C.A.8) 77 F.(2d) 565; Northern Pacific Railway Co. v. Van Dusen Harrington Co. (C.C.A.8) 60 F.(2d) 394.

■ The evidence introduced upon the second trial was not identical with that introduced at the first trial, but the issues were identical. The testimony of the plaintiff was the same. If true, he was entitled to recover. The defendant contends that it was not true and that it was contradicted by physical facts conclusively proved; namely, by proof tending to show that the plaintiff went between the cars and that the handhold was not loose at the time of the accident. The testimony that Kelly went between the cars was the same upon the second trial as upon the first, and the evidence that the handhold was not loose at the time of the accident was substantially the same. There was no direct evidence on either trial that the handhold was not in the condition that Kelly claims it was, and no witness was produced who saw it intact after the accident. All witnesses who saw it say that it was loose and hanging down when they looked at it after Kelly was hurt. There was evidence at both trials that it was not loose at Missouri Valley. Bolitho, the rear brakeman, testified that he used it at that place, and that it was then fast. Testimony as to inspections of the car, made shortly before the accident, indicated no defective handhold, while expert testimony introduced by the defend-

ant was to the effect that the handhold had been loosened with a wrench. All of this evidence tended to support the defendant's theory that the handhold was not loose at the time of the accident, but was loosened by some one after the accident had occurred, for the purpose of making it appear that Kelly's injuries had been caused by a defective handhold. This, however, was the same theory advanced upon the former trial, and was based upon substantially the same facts and circumstances. It is true that the defendant produced an additional nut and bolt expert on the second trial, and that the plaintiff produced no one to rebut the expert evidence of the defendant. The expert evidence, if believed, would have justified the conclusion that the handhold did not shake loose; but no expert expressed an opinion as to when a wrench was applied. The inference that it was after the accident was based upon motive, opportunity, the finding within a short time after the accident of a wrench in the tool box of a switch engine which, at the time of the accident, was standing near the place where the accident occurred, which wrench showed evidence of having been used upon nuts similar to those with which the handhold was fastened to the car, and the possibility that the engineer of the switch engine, who was one of the first men to reach Kelly after he was hurt, was informed by Kelly of his plight and went to the handhold, some 50 or 60 feet away, and loosened it with his wrench. The defendant's evidence would have permitted, but certainly did not compel, a finding that the plaintiff was not hurt in the manner claimed by him; and the court committed no error in denying the defendant's motion for a directed verdict.

■■■ It was not error to permit the plaintiff to cross-examine Bolitho, the rear brakeman, whom he called as his own witness upon rebuttal. Bolitho was an employee of the defendant, and had testified on its behalf as to the condition of the handhold at Missouri Valley. He was not a witness friendly to the plaintiff. It was therefore within the discretion of the court to permit the plaintiff to cross-examine him. London Guarantee & Accident Co., Limited, v. Woelfle (C.C.A.8) 83 F.(2d) 325. There is, however, one matter in this connection to which attention should be called: After plaintiff's counsel had examined this witness on rebuttal, he (the witness) was cross-examined by defend-

ant's counsel. Bolitho stated that he did not loosen the handhold. It clearly appeared that he was not present when the accident happened. He was asked, "Did you have any suspicion that somebody had taken it off?" Counsel for plaintiff, instead of objecting to this question, said, "Go ahead and answer it." Bolitho's answer was, "Yes, sir." He was then cross-examined by plaintiff's counsel at great length about his suspicions and as to why he had not mentioned them to an investigator for plaintiff, named Lush, to whom he had given a statement with respect to the accident. Whether Bolitho had suspicions or whether he had none was of no materiality whatsoever in the trial of this case. Issues are not to be determined upon the conjectures, imaginings, or suspicions of witnesses. The court of its own motion should have excluded all reference to the suspicion of Bolitho. Since the defendant first injected this suspicion into the case, it is in no position to complain of the plaintiff's having taken advantage of it in further examining Bolitho, but the suspicion had no bearing upon any issue before the jury.

■ There is no merit in the claim that it was error to permit the plaintiff to introduce evidence tending to show that the defendant could have produced, as a witness, Case, the engineer of the train involved in the accident. Kelly at the time of the accident was on the engineer's side of the train. It might reasonably have been expected that Case would be watching for Kelly's lantern signals and might well have observed where his lantern was at the time he was hurt. Kelly had testified that Case came to him within a minute and a half after the accident, and was then told about the defective handhold. It would not be unreasonable to suppose that Case had examined the handhold within a few minutes after the accident. He was a witness whom the defendant would naturally have produced if his testimony would have been favorable to it. The defendant could have offered proof to excuse his absence. We know of no reason why the plaintiff might not properly show his availability. See, in this connection, Gulf, C. & S. F. Ry. Co. v. Ellis (C.C.A.8) 54 F. 481; Hill v. United States (C.C.A.8) 234 F. 39; Lincoln Nat. Life Ins. Co. v. Erickson (C.C.A.8) 42 F. (2d) 997, 1002.

■ There is no merit in the assignment that the court erred with respect to its instructions. The excerpt from the charge

relating to the weight to be accorded opinions of experts, which is complained of by the defendant, was not excepted to, and is therefore not before us for review. Pryor et al. v. Strawn (C.C.A.8) 73 F.(2d) 595; Garrett Const. Co. v. Aldridge (C.C.A.8) 73 F.(2d) 814.

▪ The defendant claims that the court in effect expressed to the jury the opinion that the plaintiff did use or attempt to use the handhold. Taking the charge as a whole, there can be no doubt that the court left the jury free to determine for itself how the accident happened. The defendant's requested instructions were covered by the general charge in so far as they were material or proper.

▪ The defendant complains of a number of statements made by plaintiff's counsel in his closing argument to the jury, which it is claimed were both improper and prejudicial. The plaintiff asserts that, because of our former opinion in this case, there can be no reversal on this ground, since the argument on the first trial was, if anything, more vulnerable than that now before us. We have not found it necessary to make a comparison. On the first appeal, no record of the defendant's argument was preserved and made a part of the bill of exceptions, and no proper objections and exceptions were taken to the plaintiff's argument. We said [page 37 of 74 F. (2d)]: "Counsel was entitled to present his case with force and vigor, but he was not justified in an impetuous denunciation of the appellant, its attorneys and agents, or an exhortation appealing to the passion and prejudice of the jury. The argument is open to criticism, and under some circumstances would justify reversal; but, on the record presented, a reversal on this ground alone would not be warranted." In the record now before us, the arguments of both counsel have been printed in full. Counsel for defendant did not interrupt opposing counsel during his argument, but did take exceptions to it before the jury retired, thus giving the court below an opportunity to deal with the questions presented by the exceptions. The practice followed by the defendant was substantially that which we have recently held was permissible in London Guarantee & Accident Co., Limited, v. Woelfle, 83 F.(2d) 325. In that case we discussed at length the question of improper remarks in closing argument; and there would be no object in again covering the same ground. We quote the following statements from that opinion (pages 342 and 343 of 83 F.(2d): "In the trial of cases to a jury in the federal courts, the arguments of counsel must be confined to the issues of the case, the applicable law, the pertinent evidence, and such legitimate inferences as may properly be drawn therefrom. * * * The truth is that when a lawyer departs from the path of legitimate argument, he does so at his own peril and that of his client, and if his argument is both improper and prejudicial, then he has destroyed any favorable verdict that his client may obtain, unless, in some way, his error has been cured prior to the submission of the case to the jury." In the Woelfle Case, 83 F.(2d) 325, at page 343, we again called attention to the rule that we would not reverse for misconduct which an appellant's counsel had invited by his own misconduct in closing argument.

What we must determine, then, is whether counsel for plaintiff in his closing argument to the jury confined himself to the merits of the case, or whether, if he did not, it can truthfully be said that his misconduct was invited or provoked by misconduct on the part of defendant's counsel.

▪ Under a somewhat peculiar practice in Minnesota, which has been followed in both the state and federal courts, defendant's counsel in such a case as this makes the first argument, and the plaintiff has the closing. Thus defendant's counsel is obliged to present his defense argument without knowing the exact nature of his opponent's argument. He may anticipate what will be said, but he clearly has no right to anticipate that his opponent will indulge in improper argument, and, even if he has reasonable grounds for believing that that will be done, he still may not depart from the path of legitimate argument, but must protect his client's rights by taking exceptions to improper remarks.

▪ While in this case no claim is made by the plaintiff that any improper statements made by plaintiff's counsel to the jury were invited or provoked by defendant's counsel, we have the latter's argument and find therein several statements which are open to criticism. We quote two of them:

"Now, we will go on, and at Missouri Valley, which is seventy-two miles from the scene of this accident, Mr. Bolitho, the rear brakeman, rides this very car, and on this very handhold, and it is tight. He has no interest in this case. And counsel, when

he gets to his argument, to that portion about the pay checks,—and he will get to it,—will talk about pay checks, and when he does that, ladies and gentlemen, just sit back and say, 'Mr. Davis, are you here for a pay check?' If the pay check that Mr. Bolitho got from this railroad company as an employe is an incentive to commit perjury and speak lies, then I say it is also an incentive for other people, that are demanding at your hands a stupendous amount of money,—more money probably than the whole bunch of you have,—I do not know you,—but I say, if that is an incentive for Mr. Bolitho to lie, because he is an employe of this company and wants to be paid for his job, and wants to get that pay check which he earns, then probably other people that are asking for money might possibly have the same incentive."

"Have you ever seen a clearer cut bunch of men than Mr. Hall, Mr. Hanson, and Mr. Carlson? Oh, yes, but Mr. Hall and Mr. Hanson and Mr. Carlson draw their pay checks from the North Western Railroad. They are officers of the North Western Railroad, and therefore they are not believable. The only time that Mr. Davis wants anybody to believe a witness is when he is asking damages, or when he testifies on his side of the case."

Mr. Davis, counsel for the plaintiff, was not on trial, nor had he been a witness. His remuneration and his beliefs as to the credibility of the witnesses were not in any way material. The remarks should not have been made, and, in so far as the subsequent misconduct of Mr. Davis, if any, was a defense to or bore directly upon these improper statements, we think that the defendant is precluded from taking advantage of what was directly invited or provoked by its own counsel's misconduct.

While improper argument by one counsel may elicit a response by his opponent which is also improper, without requiring a reversal, it does not open up the entire field to improper argument. In New York Central R. Co. v. Johnson, 279 U.S. 310, at page 317, 49 S.Ct. 300, 303, 73 L.Ed. 706, the Supreme Court in reversing this court in a case in which we had held that the misconduct complained of did not require reversal, said: "Want of good judgment or good taste, or even misconduct on the part of either [petitioner or its counsel], was not an issue in the case

for the jury, nor could it excuse like conduct on the part of respondents' counsel."

In St. Louis S. W. Ry. Co. of Texas v. Dickens (Tex.Civ.App.) 56 S.W. 124, at page 126, the rule is thus stated: "A departure from the record is never commended, or even justified, but a party may be estopped to complain by himself going out of the record; but this estoppel arises only when he is followed out of the record by the party undertaking to reply, and does not serve as a license to ignore the record generally."

In D. & H. Truck Line et al. v. Lavallee (Tex.Civ.App.) 7 S.W.(2d) 661, at page 664, the following language appears: "Where improper matter is first injected into a case by counsel for one party, counsel for the other party would seem to have legitimate right to counteract its deleterious effect by legitimate argument in reply. But the mere fact that counsel for one party has injected improper matter into the case does not license opposing counsel to commit a similar wrong."

The Supreme Court of the United States in the Johnson Case places the duty to protect "suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice" squarely upon the trial judge. Hence the extent to which counsel may go to redress their own grievances against each other in their arguments to a jury must be limited, in view of the statement in the same case that misconduct on the part of one will not excuse like misconduct on the part of the other.

Taking up those portions of the argument of plaintiff's counsel of which defendant complains:

"The defendant seeks to tear down the weight of that testimony how? First, by the testimony of this boy. Why, there isn't a man or woman on this jury who will have to think twice as to whether or not they will take his word at its face value, when you know after he gave his first statement to the Railroad Company, they had to send to get a second one. Why, if everything is fair and honest and aboveboard, why did they want another statement from that boy? He said he gave the same statement the first time as the second. Does that square with your common sense?"

"I know how easy it is, after the accident is over, to start a defense. They sent out a man to get this statement and that

statement. I know the evolution of a personal injury lawsuit; and yet, not satisfied with the first statement that they obtained, they sent another man down to get another statement; they said, 'We have got to get another statement,' and you are asked on that kind of a defense to hesitate to give a man common ordinary justice."

"Let me ask this jury one question: If you were honest, and you went to a boy and got a statement from him as to what the facts [were], and he gave you those facts, would you again go to him to get a statement, or a different one?"

This statement had reference to defendant's witness Beshey, a young man 20 years of age, the substance of whose testimony was that he was stealing a ride on the train involved in this accident; that he was between the first and second cars behind the engine, standing on the end handholds; that at Carroll he saw Kelly on the ground as these cars passed him; that he watched and saw Kelly go between two cars of the moving train and fall backwards; that Kelly's lantern was about 2 feet from the ground; and that he never saw it 5 feet up the side of a car (as it would have been if Kelly had grasped the handhold with both hands); that he ran to Kelly and then to the engine to get help; that some one followed him back either from the engine attached to the freight train or from a nearby switch engine; that the man who followed him stooped down and talked to Kelly in low tones, and then went away, and that he did not see him afterwards. The evidence disclosed that before the trial two statements had been procured from Beshey by different claim agents of the defendant. Neither statement was introduced. Beshey testified that he had made the same statement to both. The taking of the two statements furnished no basis for the argument made, which was clearly of a prejudicial nature. The statement by counsel with reference to his knowledge of the evolution of a personal injury lawsuit was not proper argument and was not justified by anything in the record.

"The only other witness they bring in to tear down the testimony of Paul Kelly is Bolitho, a man who was willing in this case yesterday to tear the heart out of Paul Kelly, his friend for 25 years, and say he had a suspicion, and he gives him a statement on November 5th, in which he never mentioned it. You are asked to go out and say on that kind of testimony: 'We will defeat this man.' The Court will charge you that the burden of proof means the greater weight of the testimony, not the greater number of witnesses, because if lawsuits were to be decided by the greater number of witnesses, it would be the size of a man's pocket-book that determines the outcome of a lawsuit."

This argument is a natural outgrowth of the error of permitting Bolitho to testify that he had a suspicion; an error in which both plaintiff and defendant participated. As already pointed out, the fact that Bolitho had a suspicion was not evidence upon any issue. It could not be used to impeach Bolitho, because, if impeachment at all, it was impeachment upon an utterly immaterial matter. Having no proper place in the record, it was not a proper basis for the argument made or any argument at all. Standing alone, it is possible that this argument would not justify a reversal, in view of the fact that defendant's counsel was responsible for testimony as to Bolitho's suspicion.

"I want to say at the outset that this man Mr. Kelly came into this court, and in an hour and a half gave you the facts in this case honestly and squarely. It took this railroad company a day and a half to try to build up a defense that I do not believe can meet the approval of any man or woman on this jury."

And again, on the same subject: "As I said at the beginning, it took us an hour and a half to give you God's truth in this case, and it took him a day and a half to put their experts on."

There is no rule of law that the merits of a case are to be judged by the length of time it takes a party to put in his testimony. This argument was unfair and was calculated to create prejudice, although the plaintiff argues that the words "try to build up a defense" are used in an innocent sense.

"Don't you think that the fair and honest thing, so far as a trainman's rights are concerned, is for the lawyer to give to the Court and jury every fact in his possession? Mr. Rietz said he had no duty to produce Mr. Case for us. No, he didn't, but every lawyer who has been in a court of justice has the duty before God and man, to produce before the jury every witness and every fact in his possession."

It could hardly be contended that that statement fell within the scope of legitimate argument, although it was proper to argue to the jury the unfavorable inferences which might properly be drawn from the failure of a defendant to produce witnesses still in its employ whom it naturally would have produced if their testimony would have been favorable.

It is unnecessary, we think, to go any further with the analysis of the argument of counsel for the plaintiff. He asked the jury to place themselves in the position of the plaintiff's mother or son or husband; a position which would have disqualified them to act as jurors. This has been held to be improper in F. W. Woolworth Co. v. Wilson (C.C.A.5) 74 F.(2d) 439, 98 A.L.R. 681. See, also, Wells v. Ann Arbor R. Co., 184 Mich. 1, 150 N.W. 340, . Ann.Cas. 1917A, 1093, and Hughes v. City of Detroit, 161 Mich. 283, 126 N.W. 214, 137 Am.St.Rep. 504.

Counsel referred to the defense as "a trumped up case," "the miserable defense that the railroad company has put up here," "a trumped up case like that, on testimony that you must know is not true, and on testimony which they admit was not true, in the last trial," and "the only reason that they put in that kind of evidence, in my opinion, is to keep down the damages this man has honestly sustained." There is a vast difference between a defense which is without merit, but interposed in good faith, and a fraudulent or "trumped up" defense. There was nothing in the record to justify an argument that the defendant had fabricated testimony or that it did not sincerely believe that the accident happened in the manner its evidence tended to prove.

Giving due credit to the plaintiff for all improprieties committed by defendant's counsel in his argument, on such items of the argument of plaintiff's counsel as they might properly be set off against, it would be impossible for us, in view of Union Pac. R. Co. v. Field (C.C.A.8) 137 F. 14; Brown v. Walter (C.C.A.2) 62 F.(2d) 798; New York Central R. R. Co. v. Johnson, supra, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706; F. W. Woolworth Co. v. Wilson (C.C.A.5) 74 F.(2d) 439, 98 A.L.R. 681; and London Guarantee & Accident Co., Limited, v. Woelfle, supra, 83 F.(2d) 325, to hold that the defendant had a fair and impartial trial and that the verdict was one "uninfluenced by the appeals of counsel to passion or prejudice."

It is true, as the plaintiff points out, that in ruling on the motion for a new trial, the court below expressed the opinion "that the argument of plaintiff's counsel was not of such a nature as to arouse the passion and prejudice of the jury" or to justify a new trial. We think it is not humanly possible to measure the effect upon the minds of jurors of such an argument as was made or to say that it did not accomplish the purpose which it was clearly intended to accomplish; namely, the enhancement of damages. It seems probable that if plaintiff's counsel had made no argument at all, he would have won his case, but improbable that the improper argument did not affect the determination of the issue of damages. The jury were urged to consider the nature of the defense in assessing damages. This was improper. The damages allowed by the jury were $6,000 more than those allowed upon the first trial, and $9,000 more than the judge who tried the case the first time regarded as reasonable. While we have nothing to do with estimating the amount of damages properly recoverable, we can hardly overlook these facts in appraising the probable effect of the argument of plaintiff's counsel.

It is also true that the case was bitterly contested; but a bitter contest need not be an unfair one. Arguments may be forceful, colorful, or dramatic, without constituting reversible error, provided they are based upon evidence and the law and have some reasonable relation to the merits of the controversy.

There is one other matter to be considered, and that is the request by plaintiff's counsel that the jurors take down his calculations relative to the damages sustained by plaintiff. No prejudice is shown to have resulted from the request, and we think that the matter of taking notes by jurors is one which can safely be intrusted to the common sense and good judgment of the trial courts. The request that notes be taken by jurors should be addressed to the court, and communicated by it to the jurors, with suitable instructions, if notes are to be taken. There is some learning on this subject: United States v. Davis (C.C.Tenn.) 103 F. 457, affirmed (C.C.A.) 107 F. 753; Cheek v. State, 35 Ind. 492; Indianapolis & St. Louis R. R. Co. v. Miller, 71 Ill. 463; Miller v. Commonwealth, 175 Ky. 241, 194 S.W. 320; Commonwealth v. Tucker, 189 Mass. 457, 76 N.E. 127, 7 L. R.A.(N.S.) 1056; Koontz, Phillips &

Stamm v. Mylius, 77 W.Va. 499, 87 S.E. 851; Omaha Fire Ins. Co. v. Crighton, 50 Neb. 314, 69 N.W. 766. The defendant's contention that it was error for plaintiff's counsel to request the jurors to take notes of his argument is not without support. The court below cautioned the jurors that, while they might take notes if they desired, they were not bound by them. In the absence of any showing of prejudice, this would certainly not constitute a basis for a reversal.

Because of the improper remarks of counsel for plaintiff in his closing argument to the jury, the judgment is reversed, and the case remanded for a new trial.