## WESTERN COTTONOIL CO.

v.

## GILLIT.

### No. 3084.

Court of Civil Appeals of Texas.

Eastland.

May 14, 1954.

Rehearing Denied June 6, 1954.

McMahon, Springer, Smart & Walter, Abilene, Fulbright, Crooker, Freeman & Bates, Houston, for appellant.

Scarborough, Yates, Scarborough & Black, Abilene, for appellee.

GRISSOM, Chief Justice.

Doyle Gillit and wife sued Western Cottonoil Company for damages for maintaining a nuisance near their home. They alleged they were occupying certain property as their home and said company constructed an open tank nearby and emptied therein the residue of their operations, which produced a foul, obnoxious and disagreeable odor which destroyed the comfort and enjoyment of the Gillit home and its value. The company answered, among other things, that the odors produced were best described as those of cottonseed meal, hay and molasses and were not disagreeable to the average person; that in their business it was necessary to produce a com-

modity known in the trade as soap stock; that following the recent war this product could not be readily marketed and it became necessary to store it temporarily in an earthen tank. They alleged that the Gillits and other residents of the area were themselves responsible for many offensive odors; that the plaintiffs' home and adjacent residential property adjoin a little stream which is slow moving and, except in time of rainfall, is a stagnant stream which is polluted by decaying animal and vegetable matter; that the residents of the surrounding area have around them horses, cows, hogs, chickens, ducks, dogs and cats and their pens and sties drain into said creek and carcasses of dead animals are often found in its waters.

A jury found (1) that since construction of the company's soap pit, on August 1, 1952, until the trial, defendant had disposed of its soap stock in such a manner as to constitute a nuisance to plaintiffs' proper use and enjoyment of their property, (2) to their damage in the sum of $625. The court rendered judgment in accord with the verdict. The company has appealed.

In connection with the damage issue, the court instructed the jury as follows:

"In answering the foregoing Special Issue, you may take into consideration the material discomfort and annoyance to plaintiffs, if any, in the proper use and enjoyment of their home, directly and proximately resulting from the nuisance, if any, maintained by the defendant.

"In answering the foregoing Special Issue you cannot take into consideration any conditions caused by other persons, if any, contributing, if they did contribute, to the conditions made the basis of this lawsuit by the plaintiffs and

"In answering the foregoing Special Issue, you will take into consideration only damages, if any, for unreasonable and material interferences, if any, by the defendant, with the plaintiffs' use and enjoyment of their property,

taking into consideration the nature and use of the property of both parties, and the character of the community in which they are situated, and such interference, if any, must be caused by a condition which is substantially offensive, discomforting, and annoying to persons of ordinary sensibilities, tastes and habits living in the locality where plaintiffs' premises are situated."

Appellant's points are to the effect that the court erred in refusing to grant a new trial because of the inflammatory, outside the record, improper and prejudicial closing remarks of appellees' counsel wherein he stated to the jury (1) that others had obtained an injunction against appellant maintaining the soap stock pit, which was not in evidence, and wherein he (2) contrasted the wealth and power of appellant with the poverty of appellees, appealed to the jury to array class against class and to believe appellant was considerate of people who could afford luxurious homes and callous to the rights of the poor.

Volume 4 of the Statement of Facts consists of arguments on the trial and an agreement that appellant objected to certain portions of appellees' closing argument; that the court was of the opinion appellees' argument was a proper reply to appellant's argument and overruled said objections; that it was agreed the reporter might transcribe the arguments and objections as a part of the statement of facts in order that the appellate court might have the entire argument in order to determine whether the court correctly held the arguments complained of were proper replies to appellant's arguments.

The part of the closing argument of appellees' counsel complained of in Point One is: "Now, Gentlemen, they (other people) have got an injunction (against the soap stock pit) he (counsel for appellant) knows about it." Whether the manner in which defendant stored its soap stock constituted a nuisance to plaintiffs' proper use and enjoyment of their property and, if so, the amount of damages suffered by appellees, were the only questions submitted to the jury. This argument, in effect, informed

the jury that a court had already decided appellant's pit was a nuisance and had enjoined appellant from so maintaining it and that appellant's counsel knew it. Its practical effect was to tell the jury that a court had already decided against the company the first question submitted. Ordinarily, it would unquestionably constitute reversible error. City of Pampa v. Todd, Tex. Com.App., 59 S.W.2d 114, 116; Robbins v. Wynne, Tex.Com.App., 44 S.W.2d 946, 947. However, appellees contend it was a proper reply to appellant's argument. Appellees set out the following argument of their counsel, which includes that specifically complained of in point one, appellant's objections thereto, the court's ruling and the argument of appellant's counsel which it is claimed to reply to, as follows:

"(Appellees' Counsel) Now, he says he is curious to know how all these got together; and well, you look at them. You know they didn't conspire to come in here just to get some money off of anybody. But they just got tired of smelling that stuff, just got all they could take, and they went to talking to each other and got together and decided to do something about it.

"Now, he says if it is bad, the City would have done something about it. But he said the City line just goes to that creek, is the reason they haven't done anything about the creek. Well, you know the City is not going to do anything for the people that live out of the City Limits. He said if it is bad, why doesn't the tourist camps and the people do something about it. Now, gentlemen, they have got an injunction. He knows about it.

"Mr. Springer: We object to that. There is no evidence.

"Mr. Black: He knows—

"Mr. Springer: Just a minute. There is no evidence of any such a thing.

"Mr. Black: It is in reply to your argument.

"Mr. Springer: No, sir. I never said a word about it.

"Mr. Black: You said why don't the tourist camps do something about it.

"Mr. Springer: All right. I am talking about what he said was the effect of the lawsuit.

"The Court: Gentlemen—now just be seated. Don't consider what Mr. Springer said, or what Mr. Black said on that matter. Neither one of the two.

"Mr. Black: All right. You just consider the evidence, Gentlemen. The evidence. You have got some of it right here. You have heard all these people testify about it, and this cotton-oil company hasn't refuted it. They haven't denied it; but they have offered excuses; and that's all they have done is offer excuses."

Appellees contend said argument was a proper reply to the following argument of appellant's counsel:

" 'But I think if they had a stink pot like they are talking about, with all the citizens, tourists camps, three of them down in that area, still operating, if it was such a bad stink pot as that, why, the people would know about it. And demand that it be closed. What have you got—when these witnesses who testified nearly all of them except somebody like Mrs. Arnold who would close up her house to keep it out, and then run outside because she couldn't breathe in the house where it was worse. I guess it would be worse. I don't know. But, when you get down to it, you know what these lawsuits are about. They are about the coin of the realm. They want to take something out of our client's pocket.'

"I don't believe anybody used that word until he made the argument, but I did have some curiosity to know how 22 lawsuits all got filed at the same time, how 12 men and 15 or 10, whatever it was that went over there with Mr. Patterson and all got together and

they went with this Mr. Jim Hodges and he had him a lawsuit a little different from this one, but it was over in another Court, the Federal Court, they were there to testify for him, and he is here to testify for them, and they testify for one another, and then they brought in some people who are friends of the plaintiff to undertake to testify."

The argument complained of in appellant's second point, the argument made in connection therewith, the objection thereto and the court's ruling thereon, were as follows:

"The only defense is the type of neighborhood. If it was in Elmwood West we would grant it ought to be removed; but, since it is out there next to—since these people built out there next to donkey flats they don't have any right to have it removed.

"Gentlemen, I am proud to be in here representing them. They have the same right in this Court room as the people who live in Elmwood West. They have the same right in this court room as Western Cottonoil, who employs 445 people. They serve this country on jury service. Their sons go to war, just like the sons of the people out in Elmwood West. Their home is their home, just like the home of the people in Elmwood West. And, Gentlemen, don't let them down. Don't let this company run over them just because their homes may not be as nice as those in Elmwood West.

"Mr. Springer: Just a minute, Mr. Black. That is arraying class against class and there is no evidence here anybody is trying to run over anybody.

"The Court: Gentlemen, you won't consider the statement about someone trying to run over someone.

"Mr. Black: It is class against class. They brought it in here about it being—they named it Donkey Flat. They called these houses down here on Treadaway 'shacks.'

"Mr. Springer: Just a minute. I understood the Court to sustain that. That he said, right in the teeth of the Court's ruling, that it is class against class.

"The Court: I sustained the objection about somebody running over somebody. Go ahead with your argument.

"Mr. Black: Oh, yeah. It hurts. He knows they are entitled to the same rights in this Courthouse as anybody. And God forbid the day that I close my door to anybody that comes from any kind of a building down there, and just open it to the ones that come from these fine homes, or from the ones connected with Western Cotton-oil."

Appellees contend this argument was a proper reply to the following argument of appellant's counsel:

"Two: The fact that the folks down there who are now complaining are folks, who, themselves, have created a situation there which is nauseating and revolting to you good people of Abilene who have to drink that water. That is why he touched on them. He just with the touch of an old master has reached down into the evidence of this case, and just lifted out before you the points which are important— he knows that they live in an area down there known as donkey flats where those shacks are is important, too, that helps fix the character of that neighborhood, and when people are coming in here to you trying to tell you that this or that offends them so much: 'I am just horrified at the thought they make soap stock over there in that oil refinery' let's see how delicate their sensibilities are and what it takes to offend them. You have heard them testify it is only about 150 yards, it is about 450 feet there, and in the light of common knowledge, you know it is about a block and a half to the banks, where some of them don't even have outdoor toilets, they just use

the open flats, he was worried about that, and that is why he argued it. That's important.

"In other words, take the average person, the ordinary person who lives down there in the donkey flats area, the people who maintain the outdoor toilets, the pig sties, the horse lots, the chickens, the rabbits, the people who have a community out there where their hogs and their chickens and dogs and animals get into the creek, they die, and their carcasses rot and the stench rises. You are to take into consideration the thing which would be not just slightly annoying but the thing which would materially be offensive and disturbing to that person in that locality—not just to the plaintiff, but to the average person in that locality."

"There is a lot of difference between Dallas Scarborough and this plaintiff. His house, he didn't say anything about it being on the creek, said it was in Abilene; but these pictures spoke and the plaintiff in this case spoke, and I want to call your attention to that. I saw the picture of his home with his car out there. He said he paid $500.00 for his home. If he did, and this is a true picture of it, he paid more for his automobile to ride around in than he did to get that young bride a home, to provide a home for her. Just look at that. Just a shack. I tell you one that is touched as much as Dallas about building a home wouldn't have taken her down there where all that filth was, and he would have provided her a better home. If this man is able to own that car just to ride around in, he ought to be able to take that house and that car and at least make a down payment in a community where it would be decent to live.

"Now, I suppose that the wrong part of all this started way back yonder in Georgia, before I say that. Do you see that car. He said that's his car and his house. I don't know the price of the car. I drive an old Dodge. I be-

lieve it cost less than that. But that is his business, it is not mine.

"Mr. Black: Your Honor, I believe Mr. Springer has two cars, instead of just one.

"The Court: Gentlemen, you won't consider that argument about Mr. Springer's car. That has nothing to do with this case.

"Mr. Springer: He has a right to do as he pleases; but I tell you I believe a man that has that car and that house and is able-bodied and young with all the work available, that he could move out of that place with that bride.

"I tell you, as I view the matter, I don't think a man ought to be rewarded under those circumstances, and this jury ought to tell him to go back and clean up his own back yard and if somebody invades his rights then he would have some standing in Court."

In Aultman v. Dallas Ry. & Terminal Co., Tex.Sup., 260 S.W.2d 596, 599, Judge Calvert said that before a judgment could be reversed on account of argument "the argument must be improper, and it must be such as to satisfy the reviewing court that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment * * *."

In Texas Power & Light Co. v. Hering, 148 Tex. 350, 224 S.W.2d 191, 192, Judge Griffin said the appellant had the burden of showing error that probably resulted to his prejudice, but that an appellant was not required to demonstrate that but for such erroneous ruling a different judgment would have been rendered.

In Woodard v. Texas & P. Ry. Co., 126 Tex. 30, 86 S.W.2d 38, the Supreme Court held that, although much of the argument complained of was in response to argument of opposing counsel, that statements relative to the great wealth and power of the Railroad Company had no relation to the comment made by opposing counsel and on their face were manifestly improper and inexcusable, and constituted reversible error.

In Chicago & N. W. Ry. Co. v. Kelly, 8 Cir., 84 F.2d 569, 574, the court said that while improper argument by one counsel may elicit a response by his opponent which is also improper without requiring a reversal it does not open up the entire field to improper argument.

In D. & H. Truck Line Co. v. Lavallee, Tex.Civ.App., 7 S.W.2d 661, 664 (Writ Ref.), the court said:

"From these two holdings the proper rule in such cases may, we think, be readily deduced. Where improper matter is first injected into a case by counsel for one party, counsel for the other party would seem to have legitimate right to counteract its deleterious effect by legitimate argument in reply. But the mere fact that counsel for one party has injected improper matter into the case does not license opposing counsel to commit a similar wrong. In every instance the court should consider the action or statement of each attorney in relation to its probable effect upon the verdict."

In 41–B Tex.Jur., 337, 338, Sec. 280, the applicable rule is stated as follows:

"The rule of invited error, as it is sometimes called, is applicable only when the argument attempted to be justified thereunder bears a direct relation to the subject matter of the preceding argument. The mere fact that one attorney goes outside the record does not authorize adverse counsel to do likewise in an entirely different respect or in committing a similar wrong. Moreover, the rule does not authorize the use of language the purpose of which is only to inflame or prejudice the jury."

In Texas Co. v. Gibson, 131 Tex. 598, 116 S.W.2d 686, the Supreme Court held that argument contrasting the wealth and power of a defendant with plaintiff's poverty and a statement that the jury should not render a verdict for the plaintiff because the corporation had all the money and was one of the biggest corporations in the country and because the plaintiff had no money was reversible error, notwithstanding defendant's counsel had asked jurors on voir dire examination whether they would treat all parties as if they were individuals and in argument had reminded the jurors of their affirmative answers to that question. The court held that, while such comment warranted a proper reply, it could not be seized upon as a provocation to contrast the wealth and power of the corporate defendant with the poverty of the plaintiff.

In Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115, 119, Judge Garwood said:

"But the statutory right of counsel thus to speak his mind is subject to obvious limits, which excessive language may exceed—either by connoting an idea or fact without support in the record or by its very character as inflammatory. That these limitations apply to attacks on opposing counsel and witnesses as well as those on opposing parties has, for good reason, rarely been questioned. While argument otherwise excessive or improper under the above rules has been held justified by similar argument or other type of 'invitation' previously emanating from the opposing side, obviously this is so only when the relation between the argument under attack and the alleged provocation is one of reason and fairness. See Woodard v. Texas & Pacific Ry. Co.; Texas Co. v. Gibson, both supra. Otherwise counsel might well hesitate to use even the politest criticism for fear of justifying an unrestrained reply or, on the other hand, both sides may properly elect to abandon all restraint.

"The Court of Civil Appeals considered argument (a) above to be justified by the preceding argument for petitioner. The pertinent portion of the latter (set forth in detail in the opinion below) in substance attacked respondent's statements both as to the manner of the accident, the fact of her back injury, and the great degree of

her disability as untrue. As to her disability, a lack of good faith was probably also charged. All this we consider that, under the evidence, counsel had a right to do. Davis v. Hill, supra [Tex.Com.App. 298 S.W. 526]. Their language was not unrestrained and was about as respectful as the issue under discussion permitted. They used no epithets of 'liar', 'fraud', 'faker', 'cheat', or 'imposter'. It is one thing to say a woman has not told a true story or that 'she doesn't want to get well'. It is altogether another to call her names—such as 'liar'. Petitioner's counsel were entitled to make the argument they did make without thereby necessarily subjecting themselves and their client to what was in effect the inflammatory and unfair charge of insulting a woman. Such a charge in the language employed was actually more inflammatory than if counsel making it had called petitioner's counsel, witnesses or servants the same names above mentioned. The repeated objections to it should have been sustained."

See also Blohm v. Krueger, Tex.Civ. App., 297 S.W. 596, 599, (Writ. Ref. for want of Jurisdiction); Texas Employers' Ins. Ass'n v. Haywood, Tex.Sup., 266 S.W.2d 856 and 31 Texas Law Review, 18.

■ The argument complained of in appellant's second point contrasted the wealth and power of the appellant with the poverty of appellees. In his zeal,' counsel definitely and repeatedly arrayed class against class, the rich against the poor. It was improper and reasonably calculated to cause the rendition of a judgment based on prejudice instead of conviction by evidence of the justice of appellees' cause. Humphreys v. Roberson, 125 Tex. 558, 83 S.W.2d 311, 313; Stewart Oil Co. v. Brown, Tex.Civ.App., 134 S.W.2d 375, 376; Southwestern Bell Telephone Co. v. Burris, Tex. Civ.App., 68 S.W.2d 542, 544; Texas & St. Louis R. Co. v. Jarrell, 60 Tex. 267; Texas & N. O. R. Co. v. Lide, Tex.Civ. App., 117 S.W.2d 479, 480; Walgreen-Texas Co. v. Shivers, 137 Tex. 493, 154

S.W.2d 625, 631; Willis & Bro. v. McNeill, 57 Tex. 465.

■ Considering the argument which that complained of in point one is alleged to be a proper reply to, it is evident that the statement that others had obtained an injunction against maintenance of the company's soap pit was not a proper reply to argument of opposing counsel. It was inadmissible as evidence and outside the record. There was evidence from which an inference could be drawn that Mr. Hodges, who owned and operated a tourist court in the general neighborhood of appellant's plant and appellees' home and who testified for appellees as to odors emanating from appellant's pit, had a suit against appellant in a Federal Court and that appellees' witnesses testified for Hodges and Hodges and some of his witnesses were present to testify for appellees. There was no evidence that Hodges, or any one else, had obtained an injunction against maintenance of appellant's soap pit. But, if opposing counsel went out of the record, it did not justify the action of appellees' counsel in informing the jury that an injunction had been granted against maintenance of the pit and, in effect, that a court had already decided against appellant the only issue, other than the amount of damages, submitted to the jury. We also think the argument complained of in point two cannot be justified. Of course, it was caused by the stress of a hotly contested case, but the definite and repeated array of the rich and strong against the poor and weak, class against class, could have served but one purpose and that was to secure a verdict based on prejudice instead of the facts.

The arguments relative to an injunction and that appellant, in maintaining the pit, recognized the rights of the rich and ignored the rights of the poor were out of the record and were highly inflammatory and prejudicial. They were reasonably calculated to cause the rendition of an improper verdict and probably did so.

The judgment is reversed and the cause remanded.